Michael AKINS, Robert L. Taper, Joel Carrero, and William Barnes, Jr., Appellants,

v.

UNITED STATES, Appellee.

Nos. 91–CF–860, 91–CF–1026, 91–CF–1034 and 91–CF–1083.

District of Columbia Court of Appeals.

Argued March 6, 1995.

Decided June 20, 1996.

Richard T. Brown, Glen Burnie, MD, for appellant Michael Akins.

Richard S. Stolker, Rockville, MD, for appellant Robert L. Taper.

Nicholas G. Karambelas, Washington, DC, with whom Steven R. Kiersh was on the brief, for appellant Joel Carrero.

Laura L. Rose, Public Defender Service, with whom James Klein and Gretchen Franklin, Public Defender Service, were on the brief, for appellant William Barnes, Jr.

Barbara A. Grewe, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, FARRELL and RUIZ, Associate Judges.

RUIZ, Associate Judge:

This case, in which we affirm the judgment in part and remand in part, arises from offenses that were made somewhat extraordinary by the fact that its participants memorialized the developing events on film. On October 28, 1989, appellants Michael Akins, Robert Taper, Joel Carrero, and William Barnes, as well as former codefendant Bryan Davis[1] and other juvenile and unindicted coconspirators, assaulted two individuals in two separate incidents with the ultimate goal of robbing them. Lonnie Bryant, the government's key witness, testified that on the evening of October 28, he joined a group of friends that included all the appellants except Barnes in the 5400 block of Ninth Street, Northwest. One member of the group suggested beating up "pipeheads," or users of crack cocaine, and taking their money. According to Bryant, everyone present registered agreement with the plan. Shortly thereafter, appellant Barnes—who used the nickname "Kirkey"—joined the group, stopping first a few feet away for the purpose of speaking to appellant Taper and "playing with" a gun he brought by pointing it at Taper's face. A few minutes later, after joining the group, appellant Barnes put the gun some place where it was not again seen. Further conversation ensued, but Bryant could not hear its contents.

Shortly thereafter, without the active participation of appellants Barnes or Akins, the group attacked its first victim, a young man in a striped shirt who remained unidentified at the time of trial. A juvenile coconspirator, Quentin Bennett, filmed the attack from a location so close that the fear in the victim's eyes was clearly visible. A long metal pipe, of which Bennett claimed ownership at trial,[2] was used to assault and subdue the victim, who repeatedly asked why this was being done to him and indicated that he had a "ten" that the perpetrators were free to take. Towards the end of this videotaped incident, at least one individual is heard to say that he had obtained the ten. The event ended when an unknown person shouted "D.C. Police!" According to Bryant, everyone who was present scattered and sought shelter in various houses along Ninth Street. The entire incident took about two minutes, according to the time stamps appearing on the camera screen.

About fifteen minutes later, the group located its second victim, Charles Lawson. According to Bryant, this incident began when Bennett noted to his friends that he had identified "two live ones," Lawson and a companion, who had the misfortune to be walking up Ninth Street after the appellants and their coconspirators had emerged from the respective shelters in which they had hidden after the first attack. Bryant testified at trial that right before the group descended on Lawson, Carrero shouted that the others, including appellants Taper and Barnes, "all know what to do!" All the per-

---

1. Davis withdrew his appeal to this court. To the extent that the appellants have incorporated arguments made in the Davis brief, we have considered those arguments.

2. Bennett was separately adjudicated guilty of armed robbery in a proceeding initiated by the Office of the Corporation Counsel. Having been sentenced at the time of the trial that is the subject of the instant appeal, Bennett was called as a witness for the government, but was a reluctant one.

sons present indicated that they did. As appellant Carrero performed the function of cameraman and running commentator, four individuals, including appellants Akins, Taper, and Barnes, began to circle Lawson. As noted in Carrero's commentary, appellant Taper "stole" Lawson, or punched him in the face, and knocked him out. As Lawson lay on the ground unconscious, and unknown bystanders clapped and laughed, Davis spit on Lawson and Bennett urinated on the side of his face. Appellant Akins searched Lawson's pockets and recovered an undiscernible object. Appellant Barnes then urinated on Lawson's face. Carrero gave the putative viewer the benefit of a close-up of Lawson as he suffers this treatment.

Eventually some members of the group decided that Lawson should be roused and made to move on. After being kicked and shoved, Lawson was brought to his feet and various items were returned to him, including a leather jacket that someone noted was too damaged by urine to keep. Lawson staggered first into and then down the street, and tried to enter a car that apparently was not his. Theron Brown, another juvenile coconspirator, and appellant Akins, repeatedly attempted to inform a pathetically confused Lawson that his car was up the street and that he needed to go home. The taping ended after appellant Carrero had interviewed and congratulated several of the appellants about their various roles in this escapade. Appellant Barnes was seen heading away from the scene towards his own vehicle saying that he has "got to do it to him, man."

Bryant testified that as appellant Barnes entered his car, appellant Carrero noted loudly that Barnes was "going to burn" Lawson. Appellant Barnes entered his car and drove slowly towards Lawson, who seemingly was still lost.[3] Appellant Barnes stopped and exited the car, grabbed Lawson, reached back into the car, got his gun, shot Lawson in the buttocks, and drove away. The police arrived on the scene about this time and helped Lawson to be transported to Washington Hospital Center. A special police officer who inventoried Lawson's wallet at the hospital testified that there was neither money nor a Citibank credit card in the wallet, both of which Lawson claimed were there earlier in the day.

A few weeks later, on December 15, 1989, a bounty hunter was hired by a licensed bail bondsman to locate appellant Carrero, who had jumped bail on an unrelated charge. The bail bondsman and the bounty hunter had information that appellant Carrero was in New York, and after inquiring at several locations, focused their efforts on a particular apartment in the Bronx. Appellant Carrero was not at that apartment, nor did he ever return. Nevertheless, after breaking down the apartment door, the bounty hunter and the bondsman stayed at the apartment for three days and two nights, eating, sleeping, and watching videos. On the second day of their stay, appellant Carrero's brother entered the apartment and, after clearing his identity with the bounty hunter who first mistook him for Carrero, asked the bounty hunter and the bondsman whether they had seen the videotape of October 28. The bounty hunter watched the tape, took it, later left New York without Carrero, and turned the tape in to the Metropolitan Police Department. The appellants were shortly thereafter indicted for the armed robberies and the related offenses.

During the police investigation of the incident, Lawson, who suffered from serious and recurring memory loss for reasons independent of this incident, identified only appellant Barnes as a person who had played a role in the events of October 28, although Lawson could not name the role. Bryant, who would later testify at trial for the government, picked out appellant Barnes from a photo array shown to him by the police when asked to identify the person known to him as "Kirkey." According to a police detective, the juvenile cameraman Bennett also identified appellant Barnes when asked who "Kirkey" was in a photo array, by saying "That's Kirkey. He shot him." Various appellants gave statements to the police. A records search

---

**3.** Lawson testified at trial that he had stopped in the area of Ninth and Kennedy Streets to obtain directions to his home in Hyattsville, Maryland.

revealed that appellant Barnes did not have a license to carry a pistol in the District of Columbia.

After a trial by jury, all the charged participants were convicted of conspiracy to commit robbery. The jury also found (1) that appellant Akins was guilty of robbery in the second incident while armed with a pipe; (2) that appellant Taper was guilty of both robberies, committed while armed with a pipe and a pipe and pistol, respectively, as well as possession of a firearm during a crime of violence (PFCV); (3) that Carrero was also guilty of both robberies while armed with a pipe; and (4) that Barnes was guilty of the second robbery while armed with a pipe and pistol, assault with a deadly weapon, carrying a pistol without a license, and PFCV.

Various claims of error are made on appeal. Appellant Barnes claims a violation of his Sixth Amendment right to a speedy trial. Appellants Taper and Carrero claim that the bounty hunter's seizure of the videotape violated their Fourth Amendment rights. Appellants Barnes and Carrero claim that certain out-of-court statements made by Akins, Taper, and Brown were erroneously admitted into evidence in violation of Barnes' and Carrero's rights under the Confrontation Clause of the Sixth Amendment and in contravention of evidentiary rules. Appellant Barnes also challenges the admission of Bennett's out-of-court statement identifying Barnes as the shooter on the same grounds. Appellant Taper challenges the admission of the videotape and its transcript on evidentiary grounds. Almost all appellants challenge the sufficiency of the evidence to convict on various charges. We affirm all the convictions except for the convictions of appellants Barnes and Carrero for the armed robbery of Lawson, which we remand because further proceedings are necessary to determine whether certain out-of-court statements were admitted in violation of Barnes' and Carrero's right of confrontation.

## I. *The Claim of a Speedy Trial Violation*

Appellant Barnes claims that he was denied a speedy trial in contravention of the Sixth Amendment to the United States Constitution. Arrested in late January, 1990,

and indicted that April, Barnes was scheduled to be tried on November 26, 1990. On November 14, 1990, the government obtained a superseding indictment charging Barnes and Taper with the robbery of Lawson while armed with a pistol and charging all the defendants with conspiracy, not charged on the original indictment. Appellant Barnes moved to sever the conspiracy count and to proceed to trial as originally scheduled; that request was denied and the trial on all charges was continued to May 13, 1991. In addition to moving to dismiss for speedy trial violations when the case was continued in November, 1990, Barnes twice again raised his speedy trial claim in writing to the court before February of 1991.

The United States Supreme Court has identified four factors to evaluate a speedy trial claim: the length of the delay, the reasons for the delay, whether the appellant asserted his right unambiguously, and whether any prejudice arose as a result of an unreasonably lengthy delay. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972); *Gayden v. United States*, 584 A.2d 578, 583 (D.C.1990). Although a delay of more than a year creates a presumption of unreasonableness, the complexity of a case may tend to justify an otherwise excessive delay. *Gayden, supra*, 584 A.2d at 583. Delays are attributed to the parties causing them, and delays attributable to the government are classified as being of neutral or significant importance, depending on how justifiable they were. *Graves v. United States*, 490 A.2d 1086, 1092 (D.C. 1984) (en banc), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).

The initial delay in bringing the matter to its first trial date of November 26, 1990, while attributable to the government, must be deemed neutral as it was caused by court congestion, defense discovery, research, and investigation, as well as the difficulties in coordinating the trial schedules of at least five attorneys and that of the court. The second delay, between the return of the new indictment, on November 14, 1990, and the eventual trial date of May 13, 1991, however, can be counted more heavily against the government. The government could

have sought either to include the conspiracy and other added counts to the original indictment, or to obtain a superseding indictment substantially sooner than twelve days before trial.[4] The government offers no refutation of Barnes's claim that all the government's witnesses, as well as the underlying conspiracy theory, were available to the grand jury at the time of the first indictment.

▮▮ We are compelled to deny Barnes's speedy trial claim for at least three reasons. First, the case was complex and involved substantial, complicated, and novel evidentiary problems, as demonstrated by almost twenty pretrial motions that were filed by the various parties. The entire pretrial period was fifteen-and-a-half months, a delay that especially in a five-codefendant conspiracy case does not generally cross into unconstitutional territory. *See Gayden, supra*, 584 A.2d at 583; *Cates v. United States*, 379 A.2d 968, 970 (D.C.1977). Second, notwithstanding that the delay was to varying degrees attributable to the government, the fact remains that Barnes went to trial on the very second date set for that purpose. *See Tribble v. United States*, 447 A.2d 766, 768 (D.C. 1982) (requiring more than "mere delay"). Although the second trial date followed the first by several months, there is no indication that Barnes ever requested an earlier date once his motion to sever the conspiracy count on the original trial date was denied.

Third, Barnes has not met the prejudice component of the *Barker v. Wingo* four-part analysis. Although this court has recognized that pretrial anxiety may constitute a form of prejudice, as are the effects of pretrial incarceration, appellant Barnes suffered from both anxiety and the effects of incarceration already as a result of other offenses for which he either awaited sentencing or had already been sentenced. *Gaffney v. United States*, 421 A.2d 924, 929 (D.C.1980) (noting that simultaneously serving other sentences tends to minimize prejudice arising from pre-trial incarceration); *Turner v. United States*, 622 A.2d 667, 679 (D.C.1993) (observing that prior contact with criminal justice system minimizes impact of pretrial anxiety and concern). Barnes's final claim, that due to the delay, he was denied the availability as a witness of Brown, a putative coconspirator who was on the lam at the time of the May 1991, trial, is made without any concomitant claim or proof that Brown's testimony would have tended to exculpate Barnes of the charged offense, or that Brown would have been available on any earlier trial date. Thus, we find no violation of Barnes's Sixth Amendment right to a speedy trial.

## II. *The Fourth Amendment Claim*

Appellants Taper and Carrero both assert on appeal that the Fourth Amendment prohibition against unreasonable searches and seizures was violated by the acts of the bounty hunter and bondsman who forcibly entered the New York apartment and obtained the incriminating videotape. Although appellants recognize that bail bondsmen and bounty hunters are not themselves law enforcement personnel, appellants argue that the unique powers conferred on bondsmen by 18 U.S.C. § 3149 (1994), as well as the various regulatory provisions of D.C.Code §§ 23–1101–12 (1989), and Superior Court Rule of Criminal Procedure 116, sufficiently implicate the government to require that the actions of bondsmen and bounty hunters conform to the proscriptions of the Fourth Amendment. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156–57, 98 S.Ct. 1729, 1733–34, 56 L.Ed.2d 185 (1978); *Evans v. Newton*, 382 U.S. 296, 299, 86 S.Ct. 486, 488–89, 15 L.Ed.2d 373 (1966); *United States v. Lima*, 424 A.2d 113, 117 (D.C.1980) (en banc). Where, as here, the facts of the seizure are not in question, the question whether bondsmen and bounty hunters must comply with the Fourth Amendment is a legal one. *See Lima*, 424 A.2d at 117.

---

4. The government claims that Barnes's assertion of his speedy trial right was the pro forma kind of assertion seeking only dismissal, and not an immediate trial, which is accorded little weight in the Sixth Amendment analysis. *Barker v. Wingo, supra*, 407 U.S. at 529, 536, 92 S.Ct. at 2191, 2194–95. The record does not support the government's claim. Barnes demanded to go to trial on the original charges on the original date, an opportunity not afforded him because of his codefendants' unwillingness to join him at that time in the face of a superseding indictment. His assertion of the right was as explicit as required under *Barker v. Wingo* and its progeny.

Appellant Taper does not allege that his own Fourth Amendment rights were violated. Rather, he seeks to vicariously assert the rights of whichever of his codefendants could validly claim an unreasonable search or seizure. The claim that an alleged coconspirator has standing is without any support in the law; only the opposite conclusion—that "coconspirators and codefendants have been accorded no special standing"—is true. *United States v. Padilla,* 508 U.S. 77, 82, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993) (quoting *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969); *United States v. Salvucci,* 448 U.S. 83, 87, 100 S.Ct. 2547, 2550–51, 65 L.Ed.2d 619 (1980); *Simmons v. United States,* 390 U.S. 377, 389–90, 88 S.Ct. 967, 973–74, 19 L.Ed.2d 1247 (1968); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Therefore, we reject appellant Taper's Fourth Amendment claim as a matter of law.

As to appellant Carrero, we affirm the trial court's ruling based on the absence of state action. We agree with the trial judge that the bounty hunter and bail bondsman who searched the New York apartment were private actors with a contractual relationship with Carrero and were thus not controlled by the evidence-gathering guidelines applicable to state action that have evolved from the Fourth Amendment.[5]

The United States Supreme Court has frequently held that actions taken by private parties are not limited by the constraints placed on government agents by the Fourth Amendment. *United States v. Jacobsen,* 466 U.S. 109, 115, 104 S.Ct. 1652, 1657–58, 80 L.Ed.2d 85 (1984); *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980); *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921); *see Lima, supra,* 424 A.2d at 117 (citing cases). Indeed, the Court held long ago that a bail bondsman may seize the person without a warrant or other legal process. *Taylor v. Taintor,* 83 U.S. [16 Wall.] 366, 371, 21 L.Ed. 287 (1872); *see also Golla v. State,* 135 A.2d 137, 139 (Del.1957), *cert. denied,* 355 U.S. 965, 78 S.Ct. 555, 2 L.Ed.2d 539 (1958) (holding that a warrant and extradition proceedings are not required for a bondsman's arrest and transportation of a prisoner across state lines). It is worth noting that although 18 U.S.C. § 3149 entitles bondsmen to arrest individuals where they have failed to appear in court, D.C.Code § 23–582(b) also confers on private citizens the power to arrest for certain offenses. *See Lima, supra,* 424 A.2d at 119 (rejecting state action argument as applied to security officers who are not special police officers and who have "only the power of arrest of an ordinary citizen"). We perceive no authority for departing from the well-established rule that bondsmen are not subject to the Fourth Amendment as it regards the seizure of personal effects. *Cf. Burdeau, supra,* 256 U.S. at 475–76, 41 S.Ct. at 576.

Appellant Carrero aptly describes the useful service provided to the government and to law enforcement by bail bondsmen who permit the release of various criminal defendants awaiting trial or sentencing. *See Taylor v. Taintor, supra,* 83 U.S. [16 Wall.] at 371, 21 L.Ed. 287 (noting that the bondsman extends the imprisonment ordinarily delegat-

---

5. The government argues that like appellant Taper, appellant Carrero is unable to establish a reasonable expectation of privacy in the New York apartment where the videotape was found. *Minnesota v. Olson,* 495 U.S. 91, 95–96, 110 S.Ct. 1684, 1687–88, 109 L.Ed.2d 85 (1990); *California v. Greenwood,* 486 U.S. 35, 39–40, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988); *O'Connor v. Ortega,* 480 U.S. 709, 715–16, 107 S.Ct. 1492, 1496–97, 94 L.Ed.2d 714 (1987); *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 424–26, 58 L.Ed.2d 387 (1978); *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960); *Brown v. United States,* 627 A.2d 499, 502–04 (D.C.1993). The record indicates that the trial court did not ad-

dress the question whether Carrero had an expectation of privacy, and whether that expectation was one that society is prepared to regard as reasonable. *Rakas, supra,* 439 U.S. at 143–44, 99 S.Ct. at 430. It is not clear whether the trial court did not do so because it assumed that Carrero could fairly claim an expectation of privacy in the apartment, or because the trial court chose instead to rely on an independent ground, the lack of state action, to deny the suppression motion. Although we note that at trial, the government stipulated that the apartment in which the videotape was found was leased to appellant Carrero, we need not resolve the issue in light of our disposition of the state action question.

ed to the sheriff). Nevertheless, the fact that the government benefits from the existence of a particular private institution does not render that private institution subject to constitutional constraints. *See Jacobsen, supra,* 466 U.S. at 114–15, 104 S.Ct. at 1656–58 (holding that private freight carrier not subject to Fourth Amendment constraints); *Flagg Bros., supra,* 436 U.S. at 163, 98 S.Ct. at 1737 (holding that settlement between debtors and creditors not sufficiently an exclusive state function to render creditor's actions, even where statutorily delegated, the actions of the state). Carrero describes the search or evidence-recovering powers of a bondsman as "unfettered"—and so they are, by the Constitution. Those powers are exactly as fettered or unfettered by civil law as those enjoyed by private citizens. Bondsmen enjoy no particular immunity accorded government agents. Unlike a police officer who may act relying on a belief that he has probable cause, the undeputized bondsman is personally liable for persons or property erroneously seized, and no part of 18 U.S.C. § 3149 states otherwise. If Carrero has a claim, it may be against the bondsman and the bounty hunter. His relief, however, is not to prevent the government from introducing the evidence seized by them.

■ In determining that the Fourth Amendment is not implicated by the bondsman's and bounty hunter's actions, we are guided by the fact that suppression of the evidence obtained by a bondsman without warrant or consent would not serve to constrain official government conduct, a chief aim of Fourth Amendment jurisprudence. *See Arizona v. Evans,* — U.S. —, —, 115 S.Ct. 1185, 1191, 131 L.Ed.2d 34 (1995); *Alderman, supra,* 394 U.S. at 174, 89 S.Ct. at 966–67; *Linkletter v. Walker,* 381 U.S. 618, 630, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965); *Elkins v. United States,* 364 U.S. 206, 209, 80 S.Ct. 1437, 1439–40, 4 L.Ed.2d 1669 (1960). The sole goal of a bondsman pursuing his subject is the recovery of the bond issued by the bondsman that was forfeited to the court upon the subject's failure to appear. An evidentiary rule requiring the exclusion of evidence obtained without a warrant or con-

sent will not deter a bondsman from achieving his goal or, for that matter, from taking things that are not related to it. *See Lima, supra,* 424 A.2d at 118 n. 2. Unlike an officer caught "in the often competitive enterprise of ferreting out crime," [6] a bondsman's motivation to recover evidence of a crime is no greater than that of any private citizen. No particular protection against unreasonable state action guaranteed by the Constitution would be reaffirmed by the suppression of evidence seized by happenstance by a bounty hunter or bondsman whose objective is in apprehending his subject for his own independent reasons. We therefore hold that absent specific encouragement or involvement by law enforcement officers to recover evidence while in pursuit of a principal, neither a bail bondsman nor his bounty hunter agent is bound by the constraints of the Fourth Amendment. *People v. Houle,* 13 Cal.App.3d 892, 91 Cal.Rptr. 874, 875 (1970). On this basis, we affirm the denial of Carrero's motion to suppress the videotape.

### III. *The Confrontation Clause Claim*

Appellants Barnes and Carrero claim that certain out-of-court statements made by non-testifying coconspirators, admitted after the trial judge denied severance of their trials, violated their rights under the Confrontation Clause of the Sixth Amendment. Because the setting for the introduction of the challenged out-of-court statements was somewhat unusual, we set out the circumstances in detail.

Juvenile coconspirator Theron Brown had absconded at the time of trial. Prior to his disappearance, Brown had provided a statement to the police, and later testified before the grand jury indicting the appellants. At trial, appellants Akins and Taper, as well as codefendant Davis, introduced in the defense case portions of Brown's grand jury testimony that these appellants felt would tend to exculpate them. The testimony that was read to the jury on behalf of Akins and Taper included Brown's recollection that after Lawson was knocked out, Bennett and another individual urinated on him, and an unknown person searched Lawson's pockets and recov-

---

**6.** *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

ered two tickets to a Baltimore Orioles baseball game.[7] Brown stated that he did not know "Kirkey." Brown also stated to the grand jury that he was not present at the time that Lawson was shot.

As if cross-examining the absent witness, the government was permitted to impeach Brown's recorded testimony with other portions of the transcript in which Brown conceded that Akins was the person who searched Lawson's pockets, and that Brown was in fact present when Lawson was shot. Brown also claimed at the grand jury that his earlier statement to the police was a lie. Akins and Taper then rehabilitated the absent Brown with his prior consistent statement to the police that Akins searched Lawson's pockets and found only two Orioles tickets. Neither Akins nor Taper testified at trial in his own defense.

The government rebutted Akins' and Taper's evidence with their own respective statements to the police. In the statements, appellant Akins admitted searching Lawson's pants and jacket pockets and taking a credit card, but claimed that he had done so only to ascertain Lawson's identity and that he had returned the card shortly thereafter. Akins

specifically denied taking Lawson's wallet. Taper, however, told police that the group had Lawson's wallet and was throwing it around, although Taper did not know what eventually became of the wallet. Akins' and Taper's statements had not been introduced in the government's case-in-chief because prior to trial the government feared running afoul of the Sixth Amendment protections identified in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *See id.* (holding that codefendant confessions inculpating defendant are inadmissible in a joint trial).

A limiting instruction was given after the government's rebuttal case in which the jury was told to consider the police statements only against Akins and Taper and codefendant Davis.[8] Later, however, after closing argument, the jury was instructed on the nature of conspiracy liability, which essentially requires that proof of one defendant's guilt be counted against all members of the conspiracy.[9] This group liability theory notwithstanding, the trial court reminded the jury that the rebuttal evidence could not be taken into account in considering the guilt of appellants Barnes or Carrero.[10] Both appel-

---

7. Presumably, Akins and Taper considered that the activities described in Brown's statements, even if attributed to them, would lead the jury to conclude that they had not committed the indicted robbery, which charged the taking of cash and a credit card, and not other items such as baseball tickets.

8. The trial court instructed the jury that:

 [L]et me now advise you that what you just heard [the prosecutor] present is rebuttal evidence by the Government which was directed to issues that were raised by Mr. Taper and Mr. Akins and Mr. Davis only and not as to Mr. Carrero or Mr. Barnes.

9. The trial court instructed the jury that:

 [One of the government's theories of liability] holds a conspirator liable for reasonably foreseeable crimes committed by any coconspirator in furtherance of the conspiracy regardless of the personal involvement of the defendant in the crime.

 . . . .

 If you find a defendant guilty of conspiracy as charged in count one [of the indictment], you may also find him guilty of the offenses charged in counts two, five and six of this indictment . . . provided that you find that the essential elements of any given offense as de-

fined in these instructions have been established beyond a reasonable doubt. And provided that you also find beyond a reasonable doubt: First, that the offenses defined in these counts were committed by a coconspirator of the defendant pursuant to the conspiracy. Second, that the offense was a reasonably foreseeable consequence of the conspiracy charged in count one. And third, that the defendant was a member of the conspiracy at the time the offense was committed.

 *Under the conditions just defined, a defendant found guilty of a conspiracy offense may be found guilty of an offense contained within counts two, five and six of the indictment, even though he, the defendant, did not participate in the events, even though the offense was not intended as part of the original plan and even though the offense was committed by any one or more of the coconspirators, whether or not the coconspirator is also charged in the indictment provided that the offense was committed during the pendency of and in furtherance of the conspiracy.*

 (Emphasis added.)

10. The trial court again instructed the jury that:

 Certain evidence was admitted only with respect to a particular defendant. You may con-

lants Barnes and Carrero strenuously objected to the introduction of the out-of-court statements by the codefendants and the government, and repeatedly asserted that their admission required a severance under the Constitution and Superior Court Rule of Criminal Procedure 14. *See Hordge v. United States,* 545 A.2d 1249, 1258 (D.C.1988). The trial court overruled their objections and denied their request for a severance.

Appellants Barnes and Carrero claim that, in the context of a conspiracy trial in which an instruction on vicarious or imputed liability is given, the codefendants' evidence of Brown's grand jury testimony, as well as the statements of Akins and Taper to the police used by the government in its rebuttal, were inadmissible hearsay as to Barnes and Carrero, and that their admission violated evidentiary rules as well as the Confrontation Clause of the Sixth Amendment to the United States Constitution. We review the questions as a matter of law.

 Conspiracy is a unique theory of liability that renders individual defendants guilty of any offense committed by coconspirators in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489, *reh. denied,* 329 U.S. 818, 67 S.Ct. 26, 91 L.Ed. 697 (1946); *United States v. Sampol,* 204 U.S.App.D.C. 349, 404, 636 F.2d 621, 676 (1980). Special evidentiary rules apply where a conspiracy is charged or alleged, and hearsay evidence that would not ordinarily be admissible against a nondeclarant may be introduced against a coconspirator under the exception for admissions or statements of party opponent on the theory that one coconspirator is the agent of another. *Anderson v. United States,* 417 U.S. 211, 218 n. 6, 94 S.Ct. 2253, 2259 n. 6, 41 L.Ed.2d 20 (1974); *Butler v. United States,* 481 A.2d 431, 438–39 (D.C.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985) (incorporating Federal Rule of Evidence 801(d)(2)(E) into the District of Columbia's common law evidentiary rules). As this court held in *Butler,* because the agency theory underlies

conspiracy liability, the only admissions of party opponent admissible in a trial where the government seeks to assign vicarious liability to coconspirators are those statements and acts of a coconspirator made during and in furtherance of the conspiracy. *Butler, supra,* 481 A.2d at 439.

 The statements of Brown, Taper and Akins that appellants Barnes and Carrero opposed were made after, and were not in furtherance of, the conspiracy. Thus, they did not come within the coconspirators' statements subset of the admissions exception to the hearsay rule. *See Butler,* 481 A.2d at 439. Therefore, although the statements were admissible against Akins and Taper individually either because Akins and Taper were the proponents (Brown's grand jury testimony) or because they were statements of party opponent (Akins' and Taper's confessions), they were inadmissible hearsay against Barnes and Carrero in the absence of some other applicable hearsay exception. In the usual case where the government is not alleging a conspiracy, the limiting instruction given by the trial judge here may have served to avoid any harm resulting from the admission of the evidence, hearsay as against Barnes and Carrero in a joint trial. *Carpenter v. United States,* 430 A.2d 496, 503–05 (D.C.), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). As appellants Barnes and Carrero correctly note, however, a joint trial based on a conspiracy theory presents special considerations that implicate their rights under the Confrontation Clause. *See Dutton v. Evans,* 400 U.S. 74, 83, 91 S.Ct. 210, 216–17, 27 L.Ed.2d 213 (1970).

 The Confrontation Clause protects a defendant's opportunity to cross-examine a witness against him, including a codefendant who has made out-of-court statements but declines to testify at trial. *Bruton, supra,* 391 U.S. at 128, 88 S.Ct. at 1623–24; *Foster v. United States,* 548 A.2d 1370 (D.C. 1988). *Bruton* held that a defendant's rights under the Confrontation Clause were violated, requiring reversal, where a non-

sider such testimony only with respect to the defendant against whom it was offered. You must not consider it in any way in your deliberation with respect to any other defendant against whom the evidence was not admitted.

testifying codefendant's confession which named the defendant as a participant in the crime was introduced at trial, even though a limiting instruction was given advising the jury that the confession could only be used against the confessing codefendant. *Bruton, supra,* 391 U.S. at 126, 88 S.Ct. at 1622–23. The Supreme Court held that the confession was so "powerfully incriminating" that the usual limiting instruction could not be relied upon to guard against its inherent prejudice to the non-confessing codefendant. *Id.* at 135, 88 S.Ct. at 1627–28. The Supreme Court therefore reversed Bruton's conviction, and established a constitutional rule requiring that where the government seeks to introduce against a codefendant at trial his statements also naming the defendant, the government can either redact the explicit references to the defendant, or try the defendants separately.

In *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Court explained that the *Bruton* rule applied only to situations in which the non-testifying codefendant's out-of-court statement " 'expressly implicated' " the defendant, 481 U.S. at 207–08, 107 S.Ct. at 1707–08 (citing *Bruton, supra,* 391 U.S. at 124, n. 1, 88 S.Ct. at 1621, n. 1), but not to cases where the government must establish a link, or the jury make an inference, between the out-of-court statement and the defendant's guilt. *Id.* Thus, in a case where the out-of-court statement has been redacted so as not to contain any reference to the defendant, that defendant's rights under the Confrontation Clause are not violated, because the jury is expected to hear and abide by the limiting instruction even before such links are formed in the jurors' mind. In *Foster, supra,* this court addressed the situation, left open in *Richardson,* where the out-of-court statement—though redacted to delete the defendant's name—still contained references to unnamed other participants. Stating the issue on appeal to be whether the court has "the requisite degree of assurance that the jury will not improperly consider the evidence in deciding the guilt of the defendant against whom the evidence is not admissible despite a proper limiting instruction," 548 A.2d at 1378, we held that there was a "substantial risk" that the jury would implicate the defendant in the codefendant's confession when it was viewed in the context of other evidence adduced at trial. A substantial risk exists if the jury does not "have to make a substantial inference that the defendant was the person referred to ... in the redacted statement." *Id.* at 1379 (citing *United States v. Gonzalez,* 555 F.2d 308 (2d Cir.1977)).

This case presents a situation different from that considered in *Bruton, Richardson,* and *Foster.* There is a conflict between the admission in a joint trial of statements that on their face—or by virtue of a limiting instruction—are intended to incriminate only the declarant, and the application of rules permitting convictions based solely on the actions of a coconspirator. *See Pinkerton, supra,* 328 U.S. at 646–47, 66 S.Ct. at 1183–84. As the government points out, the trial court in this case redacted all identifying references in the out-of-court statements to appellants Barnes and Carrero. *See Foster, supra,* 548 A.2d at 1378. Ordinarily, such redaction would end our inquiry except to the extent that the likelihood that Barnes or Carrero would nonetheless be derivatively incriminated by the statements might have been an abuse of the trial court's discretion because a limiting instruction was insufficient to minimize the prejudice. *See Richardson, supra,* 481 U.S. at 208–11, 107 S.Ct. at 1707–09; *Carpenter, supra,* 430 A.2d at 503–05. Because the conspiracy theory embodied in the *Pinkerton* instruction underlay the appellants' own culpability in this case, however, no amount of redaction could overcome the fact that any testimonial evidence tending to incriminate a coconspirator also incriminated Barnes and Carrero, ordinarily entitling them to cross-examine its source.

■■■ Brown's grand jury testimony that appellant Akins took Orioles tickets from Lawson was introduced under the hearsay exception for prior recorded testimony. *Feaster v. United States,* 631 A.2d 400, 405 (D.C.1993). The use of this exception, rather than one of the exceptions the Supreme Court has deemed to be "firmly rooted" in our common law jurisprudence, is of importance in determining the statements' admissibility against appellants Barnes and Carrero.

*See Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980); *California v. Green,* 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970) (observing that not all admissions of hearsay statements abridge rights under the Confrontation Clause). The Confrontation Clause is only violated by the admission of incriminating evidence under a hearsay exception that is neither firmly-rooted nor reliability-based. *Ohio v. Roberts, supra,* 448 U.S. at 66 & n. 9, 100 S.Ct. at 2539 & n. 9. In other words, if the statements satisfied a recognized hearsay exception based on the statements' presumed reliability, that reliability in turn would satisfy the concerns of the Confrontation Clause. *See White v. Illinois,* 502 U.S. 346, 356, 112 S.Ct. 736, 742–43, 116 L.Ed.2d 848 (1992); *see also Williamson v. United States,* —— U.S. ——, ——, 114 S.Ct. 2431, 2437, 129 L.Ed.2d 476 (1994) (opinion of O'Connor, J., joined by Scalia, J).

■ The hearsay exception for the admission of prior recorded testimony rests upon the recognition that the party against whom the evidence is introduced has had a fair opportunity at a prior proceeding to cross-examine the person making the statement. *See Ohio v. Roberts, supra,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597; *Feaster, supra,* 631 A.2d at 405. Appellants Barnes and Carrero, however, were not able to cross-examine Theron Brown either at the grand jury or at trial. *See Pointer v. Texas,* 380 U.S. 400, 407, 85 S.Ct. 1065, 1069–70, 13 L.Ed.2d 923 (1965); *Skyers v. United States,* 619 A.2d 931, 936 (D.C.1993). Therefore, Barnes and Carrero can fairly assert that Brown's statement lacked the " 'particularized guarantees of trustworthiness' " that may overcome their objections under the Confrontation Clause. *Williamson, supra,* —— U.S. at ——, 114 S.Ct. at 2437 (citing *Lee*

*v. Illinois,* 476 U.S. 530, 543–545, 106 S.Ct. 2056, 2063–64, 90 L.Ed.2d 514 (1986)).[11]

■ Akins' and Taper's statements to the police, although not qualifying as coconspirators' statements under *Butler,* were admitted as admissions of party opponent, which is in some contexts also known as the statements of the defendant exception to the rule against hearsay.[12] Unlike some other hearsay exceptions, this exception carries with it no suggestion of inherent trustworthiness or reliability. *Cf. Ohio v. Roberts, supra,* 448 U.S. at 65–66, 100 S.Ct. at 2538–39. Rather, it operates on a theory of admissibility that depends on the declarant's ability, by taking the stand, to refute the substance of the admission or explain the circumstances of its making. *Chaabi v. United States,* 544 A.2d 1247, 1248–49 (D.C.1988). A declarant of a particular statement cannot later complain of its prejudicial admission unless he is denied the opportunity to rebut it. *Id.* Because this exception to the rule against hearsay depends upon the availability of in-court confrontation, courts make no regular inquiry into whether the statements are true or reliable, and only analyze whether the statements are likely to inculpate non-confessing defendants and redact the statements accordingly. *See, e.g., Powell v. United States,* 414 A.2d 530, 533 (D.C.1980); *see also Bourjaily v. United States,* 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987); *Foster, supra,* 548 A.2d at 1378.

■ A rule that admits statements under the "statements of the defendant" exception with respect to one defendant on the theory that he has the ability to confront it cannot be reconciled with the Confrontation Clause rights of a non-confessing codefendant who is charged with the legal consequences of the statement under a conspiracy theory of liability, yet who is in fact unable to

11. A narrower question respecting Brown's statements as to appellants Barnes and Carrero is whether the statements helped to inculpate the codefendants and thus—in this conspiracy prosecution—helped in any manner to inculpate Barnes and Carrero as well. Because the statements opened the door to the government's rebuttal, in which Akins' and Taper's much more inculpatory statements were introduced and which we discuss presently, we need not reach the question whether Brown's statements alone

so incriminated Barnes and Carrero that their admission constituted error.

12. Because the statements were made after the conspiracy ended, the statements did not come within the "coconspirators' statements" subset of the admissions hearsay exception that recognizes the shared culpability of all members of the conspiracy.

cross-examine the declarant. *See Fiswick v. United States*, 329 U.S. 211, 217, 67 S.Ct. 224, 227–28, 91 L.Ed. 196 (1946). Akins' and Taper's statements inculpated appellants Barnes and Carrero because they inculpated the speakers, who were otherwise both alleged and proven to have entered a conspiracy with Barnes and Carrero to achieve a criminal objective. Even though the statements were not made in furtherance of the conspiracy, they described its implementation and thus implicated appellants Barnes and Carrero in the substantive offense. There was no indication that at the time described in the statements, Barnes or Carrero had withdrawn from the conspiracy, *see United States v. Mardian*, 178 U.S.App.D.C. 207, 212 n. 5, 546 F.2d 973, 978 n. 5 (1976), and the taking of Lawson's wallet and credit card was not outside the foreseeable scope of that conspiracy. *See United States v. Treadwell*, 245 U.S.App.D.C. 257, 266–67, 760 F.2d 327, 336–37 (1985), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). Quite to the contrary, the taking was the conspiracy's explicit object. Because Akins' and Taper's statements provided powerfully incriminating evidence of guilt that required no "linkage" or inferential steps on the part of the jury, *see Foster, supra*, 548 A.2d at 1379, use of the statements of the defendant hearsay exception to justify "admission of [Tapers' and Akins'] confession in the joint trial violated [Barnes' and Carrero's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Bruton, supra*, 391 U.S. at 126, 88 S.Ct. at 1622.

■ Recognizing the potential for prejudice to appellants Barnes and Carrero's Confrontation Clause rights, the trial court gave a limiting instruction. We do not think, however, that the limiting instructions given here can be relied upon to overcome the specific contrary effect of the *Pinkerton* instruction that represented the government's theory of liability. By explicit instruction, the jury was told to make the inference that whatever any codefendant did was equally attributable to Barnes and Carrero. In such a situation, "the risk that the jury will not, or cannot, follow [the limiting] instructions is so great and the consequences of failure so vital to the defendant, that the practical and human limi-

tations of the jury system cannot be ignored." *Bruton, supra*, 391 U.S. at 135, 88 S.Ct. at 1627. Thus, we conclude that the admission of Akins' and Taper's statements under the statements of the defendant hearsay exception was error, even with the limiting instructions given, because it violated appellants Barnes' and Carrero's rights under the Confrontation Clause to cross-examine evidence against them.

■ Even though a greater variety of evidence is admissible in a conspiracy trial, the trial judge has a special obligation to guard against the potential misuse of evidence where defendants are joined. The court must monitor the prejudice that develops when otherwise inadmissible evidence is introduced by a codefendant or the government and sever the trials where appropriate. *See Hordge, supra*, 545 A.2d at 1258. We hold that in a joint conspiracy trial where the government relies on a theory of vicarious liability, statements may not be introduced under the statements of party opponent exception to the rule against hearsay—or any other hearsay exception that is not reliability-based—unless they are admissible as coconspirators' statements in furtherance of the conspiracy under *Butler*. *Fiswick, supra*, 329 U.S. at 217, 67 S.Ct. at 227–28 (holding that post-arrest statements are not admissible against coconspirators). We also hold that, as in *Bruton*, no limiting instruction can cure the Confrontation Clause problem in that context, and the statements must either be excluded or the defendants severed for trial. *See Carpenter, supra*, 430 A.2d at 503–04 (citing numerous cases for the proposition that where prejudice to a nondeclarant codefendant may result, "if the prosecution is to use the statement against the defendant who made it, there must be separate trials"). Given the *Pinkerton* instruction that the jury received in this case, and because the exceptions to the hearsay rule relied upon by the trial judge in this case to admit Brown's, Akins' and Taper's statements were not based on the statements' presumed reliability and were not covered by the special rule for coconspirators' statements adopted in *Butler*, they did not safeguard the right secured by

the Confrontation Clause that a defendant may test the evidence against him.[13]

Applying the *Foster* analysis to the conspiracy case before us, once we have found a violation of the Confrontation Clause, we analyze whether the error was harmless beyond a reasonable doubt. *Foster, supra,* 548 A.2d at 1379 (applying constitutional harmless-error test identified in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). If we were to analyze the evidence on this record, we could not say that we have the "requisite degree of assurance" that the jury's verdict was unaffected by the out-of-court statements of the non-testifying Brown, Taper, and Akins in evaluating the guilt of appellants Barnes and Carrero.[14]

13. We note that appellant Taper mysteriously joins appellants Barnes's claims that the admission of Brown's grand jury testimony and Taper's statement in rebuttal violated the Constitution and various evidentiary rules. We flatly reject this allegation by appellant Taper in light of the fact that he was the initial proponent of the evidence, and that the evidence offered in the government's rebuttal was in large part the audiotape statement of Taper himself, a statement clearly admissible against him. Put simply, Taper's having offered the evidence complained of by Carrero and Barnes waived the claim of error as to Taper.

Appellant Taper also joins Barnes's claim that the admission of Akins' statement against Taper was unconstitutional and improper, and that no sufficient limiting instruction was given. Counsel lodged no objection at trial; indeed, counsel for Taper explicitly assented to the propriety of the court's limiting instruction as given. *See supra* note 10. Thus, we review this claim by Taper only for plain error. Because the Confrontation Clause issue as it relates to statements of codefendants in conspiracy cases has never been squarely addressed in this court, and is one of some complexity, we conclude that the error in this case was not plain in the sense that it should have been obvious to the trial court. *See United States v. Olano,* 507 U.S. 725, 732–37, 113 S.Ct. 1770, 1776–80, 123 L.Ed.2d 508 (1993). In any event, any error as to Taper was not "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc).

14. Brown's testimony, in its entirety, stated that a member of the group went through Lawson's pockets and recovered two Orioles tickets; and that further, an unknown individual (Brown apparently did not personally know "Kirkey," i.e., appellant Barnes) urinated on Lawson. The indictment, however, charged Barnes and Carrero with robbing Lawson of his credit card and money, and we would not perceive undue prejudice deriving from the erroneous introduction of evidence concerning the taking of Orioles tickets that could not have been remedied with proper instruction regarding the charged offense. More importantly, regardless of Brown's statements to the grand jury, the searching of Lawson's pockets is apparent on the videotape, as is the act of urination, which was concededly committed by appellant Barnes. We conclude that the admis-

sion of Brown's grand jury testimony, even if error as to appellants Barnes and Carrero, would not alone have required reversal.

We are less sanguine about the admission of Akins' and Taper's statements in rebuttal. Until Akins' and Taper's statements were admitted in the government's rebuttal case, the only evidence that established that the requisite credit card and money were taken from Lawson were the image on the videotape of Akins recovering a concededly undiscernible object, an unidentifiable voice whispering the words "credit card" in the background on the videotape, and testimony showing that upon its arrival at the hospital, Lawson's wallet did not contain a credit card and some cash that Lawson claimed were present in the wallet earlier in the day. In their statements to the police, Akins and Taper provided the first direct evidence that the conspirators took Lawson's wallet and were in possession of Lawson's credit card. Appellants Barnes and Carrero were convicted of taking money from that wallet and the credit card by force and violence. The admission of the statements may have provided the most persuasive proof that the items of value charged in the indictment were taken during the videotaped incident. Although there was other evidence that might have similarly established these elements of the charged offenses, it was clearly the conspiracy theory of liability that enabled Barnes' and Carrero's convictions. Thus, we cannot say with any assurance that the jury's verdict was unaffected by the admission of Akins' and Taper's statements and that the error was thus harmless beyond a reasonable doubt. *See Chapman, supra,* 386 U.S. at 24, 87 S.Ct. at 828.

In sum, the admission of Brown's grand jury testimony is what led the government to rebut the defense cases with the admissions of Akins and Taper. The statements of Akins and Taper provided evidence directly from the participants that Akins took a credit card from Lawson, and that Taper recalled seeing the group in possession of Lawson's wallet. Although neither fact established by these statements tended to make it more likely than not that appellants Barnes or Carrero themselves committed the taking, the conspiracy theory of liability renders this evidence impermissibly prejudicial as to them. Because the out-of-court statements in this case may have provided the most powerful evidence that a credit card and cash were taken from Lawson, their admission here, taken as a whole, was not harmless beyond a reasonable doubt

We need not, however, determine at this point whether reversal of appellants Barnes' and Carrero's convictions for Lawson's armed robbery is required. There remains a substantial question whether the statements—especially the statements of Akins regarding taking Lawson's credit card—may have been alternatively admissible under the hearsay exception for statements against penal interest. *Laumer v. United States*, 409 A.2d 190, 201–03 (D.C.1979) (en banc). In certain contexts and depending on surrounding circumstances, statements knowingly made against the declarant's penal interest may be deemed sufficiently reliable to be admitted at the trial of a nondeclarant. *See Lee v. Illinois, supra*, 476 U.S. at 543–45, 106 S.Ct. at 2063–64. Although we note that the government did not proffer Akins' and Taper's statements as admissible under this hearsay exception, we also note that the trial court's error in admitting the statements as admissions of party opponent removed any incentive which the government, as the proponent of the evidence, had to argue alternative theories of admissibility.

In *Williamson, supra*, the Supreme Court addressed the admissibility against nondeclarants of statements which, though custodial, were "genuinely self-inculpatory" declarations against penal interest. *Williamson, supra*, — U.S. at —, 114 S.Ct. at 2437.´ Interpreting Federal Rule of Evidence 804(b)(3), which this court adopted as a local rule of evidence in *Laumer, supra*, the Court pointed out that this hearsay exception is "founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson, supra*, — U.S. at —, 114 S.Ct. at 2435. The Court further noted, in a passage highly relevant to our present case, that "a declarant's squarely self-inculpatory confession— 'yes, I killed X'—will likely be admissible

under [the exception for statements against penal interest] against accomplices of his who are being tried under a co-conspirator liability theory." *Id.* at —, 114 S.Ct. at 2436 (citing *Pinkerton, supra*, 328 U.S. at 647, 66 S.Ct. at 1184).

Although the Supreme Court has not squarely addressed the constitutional issue arising under our facts, it is likely that statements which satisfy the requirements of the exception for declarations against penal interest would simultaneously withstand Confrontation Clause objections. Notably, Justice O'Connor explained in dictum that "the very fact that a statement is genuinely-self-inculpatory ... is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." [15] *Id.* at —, 114 S.Ct. at 2437. We should therefore consider whether the statements that should have been excluded as statements of the defendant would alternatively have been admissible as statements against penal interest. [16] "If evidence erroneously allowed in under one rule [of evidence] would nonetheless have been admissible under another, no substantial right of the defendant has been affected." *United States v. Beckham*, 296 U.S.App.D.C. 311, 315 n. 3, 968 F.2d 47, 51 n. 3 (1992).

This court, however, cannot decide in the first instance whether a statement qualifies as a declaration against penal interest. Following the Supreme Court, we have recognized the "fact-intensive" nature of the inquiry, which "require[s] careful examination [by the trial judge] of all the circumstances surrounding the criminal activity involved." *Williamson, supra*, — U.S. at —, 114 S.Ct. at 2437; *accord, Laumer, supra*, 409 A.2d at 201–03. We therefore remand this case for a determination by the trial court of whether the statements of Taper and Akins that the government introduced over objection as statements of the defendant qualified

where the jury was instructed on conspiracy liability.

15. Although only Justice Scalia joined the portion of the opinion in which Justice O'Connor adverted to the constitutional issue, none of the other Justices took express issue with her observation on this point.

16. Although the trial judge did not admit the statements on the against-penal-interest theory, this court may affirm a judgment of conviction on grounds other than those relied on by the trial court. *See Purce v. United States*, 482 A.2d 772, 775 (D.C.1984).

as statements against the declarants' penal interest that the declarants would not have made "unless they believe[d] them to be true." *Williamson, supra,* —— U.S. at ——, 114 S.Ct. at 2435.[17]

On remand, the parties may brief and argue both the evidentiary and constitutional issues to the trial court. In the event that the trial court determines that some statements, or portions of some statements, by Akins and Taper are admissible as statements against penal interest and not others, the trial court should then consider the question whether a new trial is warranted because the jury may have considered the inadmissible statements in reaching its verdict on Lawson's armed robbery as to Barnes and Carrero. Although "we owe no deference to the trial court's views concerning harmlessness," because we remand the case in any event to the trial court for a fact-intensive inquiry, we direct that the trial court enter findings as to "evidentiary and subsidiary facts" concerning the trial evidence *in toto* that will enable us better to assess the harmlessness question if appellants Barnes and Carrero need to seek further review by us of any adverse ruling that may yet be made. *Davis v. United States,* 564 A.2d 31, 42 (D.C. 1989) (en banc).

## IV. *The Claim that Bennett's Out–of–Court Identification Was Inadmissible Hearsay and Violated the Confrontation Clause*

■ Four months after the night in question, Bennett met with the police and spoke about the events of October 28. After having been shown a photo array containing Barnes's photograph, Bennett, who knew Barnes, said "That's Kirkey. He shot him." At trial, Bennett did not testify that Barnes shot Lawson. To the contrary, Bennett denied that he had witnessed the shooting, claiming that at the time that Lawson was shot, Bennett was no longer paying attention to the unfolding events, and further stated that he did not recall being shown a photo array by the police. The government then called a detective who reported Bennett's out-of-court statement identifying Barnes as the shooter over defense objection. Appellant Barnes claims that Bennett's out-of-court statement to the police should not have been admitted under the hearsay exception for out-of-court identifications because Bennett repudiated his earlier identifying statement at trial. *Fletcher v. United States,* 524 A.2d 40, 43 (D.C.1987); *In re L.D.O.,* 400 A.2d 1055 (D.C.1979). Specifically, appellant Barnes claims that Bennett's asserted inability to recall being shown the photo array constituted a repudiation of the prior identification that rendered him unavailable for cross-examination, in violation of Barnes's rights under the Confrontation Clause.

We need not decide either the evidentiary or constitutional claim, because any error in admitting the statement was harmless beyond a reasonable doubt. *See Chapman, supra,* 386 U.S. at 24, 87 S.Ct. at 828. The evidence against appellant Barnes regarding Lawson's shooting was exceedingly strong, and the government's case did not significantly benefit from Bennett's purported out-

---

17. In anticipating that such genuinely self-inculpatory statements would overcome Constitutional objections, we are mindful that frequently, as in the case of Taper's statements about Lawson's wallet, Confrontation Clause concerns may inhere in asserted statements against penal interest that themselves "incriminate[ ] an accomplice," *Lee v. Illinois, supra,* 476 U.S. at 542, 106 S.Ct. at 2063, and that "mitigate the appearance of [the declarant's] own culpability by spreading the blame [to others]." *Id.* at 544, 106 S.Ct. at 2064. We note that *Lee v. Illinois* reaffirmed *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), in "declaring presumptively unreliable accomplices' confessions that incriminate defendants." 476 U.S. at 541, 106 S.Ct. at 2062. Nevertheless, because nothing in *Lee* casts doubt on the constitutional reliability of state-

ments that implicate the declarant and no one else, we do not address whether and which portions of the statements admitted at trial in this case would be admissible under this exception. We simply note the Supreme Court's concern that trial courts assess with special caution statements describing the activities of persons other than the declarant if the statement is to be used in assessing the nondeclarant's guilt. *Williamson, supra,* —— U.S. at ——, 114 S.Ct. at 2435 ("The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.").

of-court identification of Barnes as the shooter. Bryant testified that appellant Barnes had a gun, pointed it at Taper, and later shot Lawson. Lawson himself had identified appellant Barnes as one of his assailants. Appellant Barnes is visible on the videotape shown to the jury, mentioning his intention to "do it to" Lawson, mere seconds or minutes before Lawson was shot. Bryant's version of the events was corroborated by two independent eyewitnesses who lived on the block. Those eyewitnesses, short of identifying the shooter, affirmed Bryant's testimony in all material respects. Any error in admitting Bennett's out-of-court statement does not in this case require reversal.

### V. *Admission of The Videotape*

Appellant Taper's assertion that the trial court abused its discretion in admitting the videotape itself, in admitting the audio portion of the videotape, and in permitting the government to provide the jury with a transcript of the discernible voices on the videotape, merits very little discussion. It is well-established that a trial court has discretion in permitting the use of contemporaneous recordings. *Springer v. United States,* 388 A.2d 846, 852 (D.C.1978); *Monroe v. United States,* 98 U.S.App.D.C. 228, 234, 234 F.2d 49, 55, *cert. denied,* 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956). In order to introduce a tape recording, the government must show that the tapes are authentic, accurate, and trustworthy. *Springer, supra,* 388 A.2d at 853. The trial court may decide whether problems in audibility render the tape as a whole untrustworthy. *Id.* The admission of a corroborating transcript is also committed to the sound discretion of the trial court. *Id.* Thus, we review appellant Taper's claim concerning admission of the videotape for abuse of discretion.

The trial court in this case carefully and painstakingly reviewed the tape and the government's transcript. The court determined that all of the tape was accurate and trustworthy, and that most of the transcript, vigorously debated by the parties, was reliable. Significantly, those portions of the transcript that were not sufficiently reliable were subsequently excised by the government with a directive from the court that the word "unintelligible" be substituted for the government's interpretation of the spoken phrases. Only the tape, and not the transcript, was submitted to the jury, and the court gave an instruction that the transcript was not evidence.

In light of the caution taken by the trial court in determining the accuracy of the visual and audio recording and the transcript, we are unpersuaded that the admission of the tape and transcript constituted an abuse of discretion. *Harrison v. United States,* 526 A.2d 1377, 1379 (D.C.1987); *Springer, supra,* 388 A.2d at 852–54. Deciphering the unintelligible audio portions of tape was left, as it should have been, to the jury. There is no merit whatsoever to appellant Taper's claim that a partial transcript directed unfair focus to those more audible portions of the filmed events. Like a witness with only partial memory, the fact that some of the events were more visible and more clearly heard on the videotape than others does not create unfair prejudice. A partial transcript or a partially audible tape recording is simply the evidence that is available. Where unjust inferences are not likely to be drawn from the evidence that is presented, evidence is not rendered inadmissible simply because the government doesn't have more or better evidence.[18]

### VI. *The Sufficiency of the Evidence*

Although the fact-finding process undertaken by the jury with regard to most of the night's events was somewhat facilitated by the use of the appellants' contemporaneous videotape recording, the appellants individually raise claims as to the sufficiency of the evidence on various counts, each of which we address. In reviewing claims of eviden-

---

**18.** Appellant Taper also claims that the court abused its discretion in permitting the government to lead Bryant through that part of his testimony where he made voice identifications of the various speakers on the videotape. The government actually did not lead Bryant, but merely focused the questioning on each individual statement by asking, as to each statement, whether Bryant knew who the speaker was. A question is leading only where it suggests an answer. BLACK'S LAW DICTIONARY 888–89 (6th ed. 1990).

tiary insufficiency, we view the evidence in the light most favorable to the government, and consider whether there was enough evidence from which a reasonable juror could conclude guilt beyond a reasonable doubt. *Douglas v. United States,* 570 A.2d 772, 774 (D.C.1990). As we have noted, when the government has established and proceeded on a theory of conspiracy, any actions taken by a member of that conspiracy in furtherance of the conspiracy is chargeable against each individual member just as if he had undertaken the action himself. *United States v. Bridgeman,* 173 U.S.App.D.C. 150, 159, 523 F.2d 1099, 1108 (1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206 (1976).

■ Appellant Akins claims that the evidence was insufficient as a matter of law to convict him of Lawson's robbery. Akins makes this claim even though he is the one person who is clearly visible on the videotape searching an unconscious Lawson's pockets and recovering an unknown object. Appellant Akins was also the initial proponent at trial of the missing Brown's grand jury testimony that led to the introduction of Akins's admission to the police that he had recovered one of Lawson's credit cards during the search.[19] Lawson testified that he had his credit card before the incident, and the special police officer at the hospital testified that there was no credit card in Lawson's wallet when it was inventoried at the Washington Hospital Center. There was more than sufficient evidence for the jury to find Akins guilty of Lawson's robbery beyond a reasonable doubt.

■ Appellants Akins, Taper and Barnes similarly argue that there was insufficient evidence that they had entered a conspiracy to rob. Proof that an individual entered a conspiracy requires proof that he agreed with one or more other persons to commit a crime and that one of the parties to the agreement commit an overt act in fur-

therance of the stated goal. *Belton v. United States,* 581 A.2d 1205, 1209 (D.C.1990). Bryant testified that Akins was present when someone first suggested robbing pipeheads and, although cross-examined on this point, Bryant maintained that everyone present agreed. Akins then helped his coconspirators to circle Lawson and isolate Lawson from his companion. After appellant Taper knocked Lawson out, appellant Akins was the one who initiated searching Lawson's pockets. Given the ability of the jury to make legitimate inferences from the evidence presented, a reasonable juror could easily conclude that Akins and Taper had entered an agreement with others forcibly to deprive Lawson of valuable property.[20]

■ Although appellant Barnes arrived on the scene after the initial agreement described by Bryant was formed, evidence was presented that more conversation on an unknown topic ensued after Barnes arrived. More importantly, Bryant testified that appellant Barnes watched the commission of the first robbery from the porch of a nearby house and then, following appellant Carrero's directive that the coconspirators "all knew what to do" at the beginning of the second incident of the night, circled the hapless Lawson when he came into the block. After Lawson was rendered unconscious, the videotape showed that appellant Barnes urinated on Lawson within seconds of appellant Akins' searching his pockets. It requires no great inferential leap to deduce that appellant Barnes agreed to commit this robbery. The jury was entitled to conclude that the conversation that occurred after Barnes's arrival was still on the subject of robbery, and it was also entitled to conclude that even if appellant Barnes had not earlier joined the conspiracy, his witnessing the first robbery revealed his knowledge of the plan and his assistance in isolating Lawson expressed his agreement thereto, as well as his desire to bring about the plan's ultimate result. It

**19.** Although Akins claimed to the police that he only took the credit card to ascertain Lawson's identity, the jury was free to credit that part of Akins's statement that incriminated him, while discrediting that part that negated culpability.

**20.** Agreement to commit an act can certainly be inferred in this case by appellant Akins' and Tapers' personal commission of actions in furtherance of the ultimate goal. *See United States v. Briscoe,* 896 F.2d 1476, 1505 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990).

may well be, as Barnes contends, that Barnes's urination on Lawson was a random and independent act that failed to serve the underlying goal. Nevertheless, the commission of this act, as well as the eventual shooting, both closely following in time Barnes's participation in what is plainly a concerted assault on Lawson, further evidence Barnes's knowledge of the conspiracy and his willing participation in the crimes committed by the group.

█ Appellant Akins finally contends that the evidence was insufficient that the robbery of Lawson of which he was convicted was committed while armed with a pipe. As the videotape plainly shows, consistent with Bennett's testimony at trial, when the group encountered Lawson, Bennett was holding the same pipe or pole that was earlier used to subdue the first victim. Appellant Akins asserts that this item was not actually used in the commission of the robbery, and that its dangerousness in connection with the incident needed to be independently proved. *See Cooper v. United States*, 368 A.2d 554 (D.C.1977). We conclude that the description given of the pipe at trial suggesting that it was two-and-a-half feet long, together with the image of Bennett holding it threateningly in the air as Lawson is descended upon, as well as its prior use as a weapon during the first robbery as appellant Akins looked on, were sufficient for a jury to find that the pipe was a dangerous weapon and that it was employed to inspire fear in Lawson in order to facilitate his robbery. *Arthur v. United States*, 602 A.2d 174, 177 (D.C.1992); *Strong v. United States*, 581 A.2d 383, 386 (D.C. 1990).

█ We also reject the claims of evidentiary insufficiency advanced by appellants Taper and Barnes regarding their convictions for robbery of Lawson while armed with a pistol. The evidence established that Barnes pointed his gun "playfully" at Taper shortly before the first robbery, and inferentially, that Taper knew that Barnes pos-

sessed the gun. *Abrams v. United States*, 531 A.2d 964 (D.C.1987); *Battle v. United States*, 515 A.2d 1120, 1127–28 (1986). Because Barnes shot Lawson within minutes of Lawson's robbery, we find that the evidence was sufficient for a reasonable juror to conclude that appellant Barnes, during Lawson's robbery, had actual possession of the pistol and thus that he, and his coconspirator Taper, were permissibly convicted of robbing Lawson while armed with a pistol.[21]

### Conclusion

We thus affirm the convictions of appellants Akins and Taper; we also affirm the convictions of appellants Carrero and Barnes except those for the armed robbery of Charles Lawson, which we remand for further proceedings consistent with this opinion.

*So ordered.*

FARRELL, Associate Judge, concurring.

I join Judge Ruiz's thoughtful opinion with this small qualification. We need not decide whether *any* limiting instruction, combined with the *Pinkerton* charge, would set too contradictory a mental task before the jury. Since the issue here is a constitutional one, the burden of persuading us of the efficacy of a particular limiting instruction must be on the government. I am not convinced that the instruction here did the job. Hence the need for the remand we order, to decide in effect whether the instruction was superfluous.

SCHWELB, Associate Judge, concurring in part and dissenting in part:

Two of the trial judge's instructions to the jury in this case were inconsistent with one another. We must decide whether this inconsistency precludes affirmance of the convictions of Barnes and Carrero.

The judge instructed the jury that the statements of Akins and Taper to the police were admitted only against Akins, Taper, and Davis. See maj. op. at 1027 n. 8. This

---

**21.** Taper also claims that his conviction for PFCV must be reversed. We affirm this conviction in light of Taper's knowledge that Barnes had a gun as well as Taper's joining the conspiracy to rob Lawson while Barnes was armed with a pistol. The proof of PFCV does not require actual possession of a firearm by each coconspirator or participant. *See United States v. Poston*, 284 U.S.App.D.C. 125, 128–29, 902 F.2d 90, 93–94 (1990).

limiting instruction, standing alone, directed the jury not to consider these statements as evidence against Barnes and Carrero. *See also id.* at 1027 n. 10.

In his final instructions, however, the judge charged the jury, in conformity with *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946), that evidence of one conspirator's guilt was admissible against all members of the conspiracy. See maj. op. at 1027 n. 9. There was ample evidence that Barnes and Carrero were among the conspirators. Under this *"Pinkerton* instruction," therefore, the statements of Akins and Taper to the police were evidence against Barnes and Carrero.

On their face, the "limiting" instruction and the *"Pinkerton* instruction" cannot be reconciled with one another. The codefendants' statements to the police could not simultaneously be (1) receivable only against Akins, Taper and Davis, but (2) a part of the evidence against Barnes and Carrero. The jurors were thus instructed to follow both the affirmative and the negative of the same proposition.

There was, however, a significant contextual difference between the two inconsistent instructions. In the limiting instruction, the judge told the jurors the purposes for which they could consider the codefendants' statements to the police. That instruction dealt explicitly with the evidence here in question, and only with that evidence. In the *Pinkerton* instruction, on the other hand, the judge apprised the jurors of a general principle, without specific application. In my opinion, the proposition that the particular governs the general is consistent with common sense, and the jurors are likely to have applied it here.

Let us suppose that the trial judge had given the jury the same limiting instruction, and that the judge had then specified, in the *Pinkerton* instruction, that the principle of vicarious liability articulated therein applied to the record as a whole *with the exception of the statements to the police by Akins and Taper.* It would then have been clear that the limiting instruction trumped the *Pinkerton* instruction.

Surely, in my hypothetical, there would have been no reversible error. I would not be inclined to extend the rule of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to a situation in which the codefendants' statements did not identify the appellants, where those statements have incriminated the appellants only derivatively, and where the jurors have been instructed, unambiguously and without qualification, not to consider those statements against the appellants at all.

In the present case, the conflict between the two instructions was not so explicitly resolved for the jurors. Because the limiting instruction would have been altogether superfluous if it did not trump the *Pinkerton* instruction, however, the jurors can hardly have ignored it. From the perspective of a reasonable jury, the difference between my hypothetical charge and the instruction actually given is, in my opinion, very slight. I discern no appreciable possibility that a jury which convicted Barnes and Carrero after having been instructed as this jury was instructed would have failed to convict them if my hypothetical instruction had been given instead.

Moreover, I agree with the government that

> even if *Bruton* were extended to include nonidentification evidence and even if the instruction was inadequate, admission of the codefendants' statements in this case was harmless beyond a reasonable doubt. First, there was extensive other evidence that Lawson's credit card was taken. There was the plan to rob, the videotape showing Akins going through Lawson's pockets on two occasions and removing some object from them, Lawson's testimony that when he came into the block he had a credit card and cash, the officer's testimony that when Lawson arrived at the hospital a short time later the credit card and money were missing, and the videotape's portrayal of a person, identified by location as Barnes, telling Carrero that they had gotten the credit card from Lawson. In addition, Akins' statement was that he did not take the credit card but

merely looked at it and threw it back. Thus, on its face it did not implicate anyone in a robbery. Similarly, Taper's statement merely claimed that the wallet was tossed around. From Lawson's testimony it was clear that Lawson got the wallet back and nothing in Taper's statement demonstrated that anything was removed from it before Lawson retrieved it. Finally, the contested issues for Carrero and Barnes were whether they joined the conspiracy and/or aided and abetted the robberies, not whether robberies occurred.[1] Therefore, this court can confidently conclude that the admission of Akins' and Taper's statements did not in any way affect the jury's verdicts against Barnes and Carrero.

For the foregoing reasons, I would affirm the convictions of Barnes and Carrero.[2] In all other respects, I join the opinion of the court.

---

1. In her opening statement, Barnes' attorney stated:

 The Government has charged Mr. Barnes with armed robberies. How will we know that he didn't commit any armed robberies?

 Well, you will know for that first incident that Mr. Barnes was not even there. You will know that he didn't commit that armed robbery. And what about the second one, ladies and gentlemen? Look at the videotape. Mr. Barnes does not punch Mr. Lawson, Mr. Barnes does not go through Mr. Lawson's pockets, Mr. Barnes does not take anything from Mr. Lawson.

 The videotape will show you that Mr. Barnes did not commit any robbery.

 In his opening statement, Carrero's attorney took a similar tack:

 The Government says well, these men went out and robbed someone. The Government talks about going through anyone's pockets. Joel Carrero never went through anyone's pockets.... Joel Carrero did not try to rob anybody.... So, in all these instances, the punching, the urinating, kicking, robbing, the shooting, Joel Carrero did not do any of those acts on that night....

 The closing arguments presented by both attorneys were consistent with their opening statements. Neither counsel ever suggested to the jury that the prosecution had failed to prove the commission of any robbery at all.

2. My vote for affirmance makes it unnecessary for me to reach the question whether the challenged evidence was admissible against Barnes and Carrero under the hearsay exception for statements against penal interest.