**UNITED STATES of America**

v.

**Robert A. BECKHAM, Appellant.**

**No. 91–3051.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1992.

Decided June 19, 1992.

M. Elizabeth Kent, Washington, D.C. (appointed by this Court) for appellant.

Kenneth F. Whitted, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Thomas C. Black, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before: SILBERMAN, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Robert A. Beckham was convicted of possession with intent to distribute crack cocaine and of aiding and abetting the distribution of crack. He appeals his convictions on two grounds: he argues that hearsay testimony was improperly introduced at his trial and that he was entitled to a jury instruction on the lesser-included offense of simple possession. Beckham also claims that the district court erred in sentencing him, because the court mistakenly believed that it lacked authority under the Sentencing Guidelines to make a downward departure from the indicated guideline range. We affirm Beckham's conviction but agree that the district court misunderstood its authority to depart downward. We therefore remand the case to the district court for resentencing.

## I.

Several undercover police officers on patrol late one evening in August, 1990, noticed what appeared to be several persons engaged in drug transactions in the backyard of a house located at 5036 F Street, S.E., in Washington, D.C. Crossing the street to get a better look, one of the officers, Officer Dunston, saw two people in the yard: Robert Beckham was in a chair in the walkway leading up to the rear door of the house, and Monica Monroe sat on a bench approximately two feet away.[1] As Officer Dunston approached the yard, Monroe inquired, "Are you looking?" Officer Dunston said that he was, and Monroe asked if he wanted "a fifty," which the officer took to mean a fifty dollar rock of crack.

Officer Dunston replied yes, walked into the yard, and stood directly in front of Monroe, who reached into her pants pocket and produced a clear ziplock bag containing a single rock of crack. Beckham remained seated two feet away. Officer Dunston inspected the rock and asked Monroe if he could purchase another fifty. Monroe replied, "I only had one, but you can get another from my buddy." At that moment, Beckham got up from his chair, walked past Dunston and Monroe to the far end of the bench on which Monroe was seated, and removed a large plastic bag, which contained numerous smaller ziplock bags, from underneath the bench. As Beckham began to open the bag, Officer Dunston identified himself as a police officer and arrested both Monroe and Beckham. The large plastic bag was found to contain slightly more than 13 grams of 89% pure crack, packaged in 34 smaller, $50 bags. A government drug expert testified that this packaging and amount was consistent with drug distribution and inconsistent with personal consumption.

The defense had an entirely different version of events. According to the appellant, this was "the case of the mysterious glove." Appellant's Br. at 20. Beckham had come to 5036 F Street the night of his arrest to visit his friend Monica Monroe and her sister, Marie Ward, who lived there. He brought over a six-pack of beer, which he placed in Ward's refrigerator. He began the evening by drinking a beer in the backyard with Monroe. As he sat in the yard chatting with her and several other friends—drugs were never exchanged or even mentioned—he noticed Officer Dun-

---

1. At trial, Officer Dunston did not state that he had observed Beckham or Monroe in the yard prior to crossing the street.

ston approach the yard, sweating and tired. According to Beckham, Monroe asked Officer Dunston several times if he was all right, but Dunston never responded. Instead, Dunston walked into the backyard and began talking in low tones with Monroe. Beckham claimed that he never saw Monroe and Dunston exchange anything and that he did not hear what was said.

Beckham testified that while Monroe and Dunston were conversing, he finished his first beer and got up from his chair to get another one from the refrigerator. As he walked to the back door of the house, he noticed an object lying between the walkway and the bench. He knelt down to examine it and discovered that it was a dirty, tannish, suede man's glove. He had never seen it before. When he picked it up, intending to ask whether anyone in the house might have lost it, he felt something bulky in its palm. Intrigued, he turned it upside down, and a plastic bag, about the size of a golf ball, fell into his hand. He held the plastic bag for several seconds, trying to figure out what was inside of it, but before he could, he noticed a movement over his left shoulder. This turned out to be Officer Dunston with his gun drawn. Beckham dropped the bag and the glove and put his hands in the air. Although several other defense witnesses testified that they had noticed the glove lying in the yard or had seen it in the hands of the arresting officers, the officers denied having ever seen a glove, and the glove did not appear at trial.

The jury, obviously disbelieving the story of the mysterious glove, convicted Beckham of possession with intent to distribute and of aiding and abetting Monroe. *See* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2. Beckham received a sentence of 30 years in prison and eight years of supervised release, largely because he was classified as a career offender under § 4B1.1 of the Sentencing Guidelines based on two prior felony convictions. Beckham was only 18 years old at the time he committed one of the two offenses upon which his career offender designation was predicated. That armed robbery occurred 15 years ago, and for most of the intervening time, Beckham

has apparently not been convicted of other crimes. The only other offense supporting the career offender designation, attempted possession with intent to distribute cocaine, occurred 13 years after the robbery conviction, in 1988. For the past decade, Beckham has been steadily employed doing auto body work. Appellant requested a downward departure from the guidelines range, but the district judge, although he felt that the 30 year sentence was "extraordinarily harsh," denied the request. The judge said that he had no discretion to make a downward departure.

## II.

Beckham first challenges his conviction on the ground that it was obtained through use of impermissible hearsay, in violation of the Confrontation Clause of the Constitution. *See* U.S CONST. amend VI. Beckham argues that the district court erred in denying a motion *in limine* and permitting the prosecution to introduce through Officer Dunston Monica Monroe's statement, "I only had one, but you can get another from my buddy." It is asserted that this statement was the most important evidence of Beckham's intent to distribute. Monroe failed to appear for trial and was therefore unavailable to testify and to be cross-examined. If he had cross-examined Monroe, Beckham tells us, she would have said, as she apparently did later at her own trial, that her statement had been "you can get another from *anybody*," not from "my buddy." The government's case would have been correspondingly weaker.

 The district court admitted Monroe's statement against Beckham under the hearsay exception for statements of a coconspirator. *See* FED.R.EVID. 801(d)(2)(E). But the only evidence relied on by the district court in making the necessary predicate finding that Beckham and Monroe were engaged in a conspiracy, *see Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987)— and the only evidence of conspiracy that existed—was the hearsay statement itself, Beckham's proximity to Monroe in the

yard, and their apparent acquaintance.[2] The hearsay statement may be considered in finding that a conspiracy existed, *see id.* at 181, but the statement may not be the sole basis for such a ruling. Under our precedent, there must be independent evidence of a conspiracy as well. *See United States v. Washington,* 952 F.2d 1402, 1407 (D.C.Cir.1991); *cf. Bourjaily,* 483 U.S. at 181, 107 S.Ct. at 2781 (reserving question whether independent evidence is necessary). But the independent evidence here—mere physical proximity and friendship—does not provide support for inferring that Monroe and Beckham "had the specific intent to further [a] common unlawful objective." *United States v. Tarantino,* 846 F.2d 1384, 1392 (D.C.Cir.) (per curiam), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988).

 Even if we were to take Monroe's statement into account, the evidence tends to show at most that Monroe turned to Beckham as an alternative source of supply; it provides scant basis for inferring that Monroe and Beckham were joint venturers in a criminal enterprise or had any sort of prior agreement—the essence of a conspiracy. *See Iannelli v. United States,* 420 U.S. 770, 777 & n. 10, 95 S.Ct. 1284, 1289 & n. 10, 43 L.Ed.2d 616 (1975). In *United States v. Morris,* 836 F.2d 1371 (D.C.Cir.1988), we rejected an argument that a conspiratorial agreement could be shown based solely on a drug dealer's occasional purchases from a supplier. *See id.* at 1374. Monroe and Beckham's interaction prior to and during the charged drug sale suggests even less than a formal buyer-seller relationship. They may well have aided and abetted one another's drug sales and may therefore be liable for each other's distribution or possession with intent to distribute crimes, but aiding and abetting is different from committing the independent crime of conspiracy. *See Iannelli,* 420 U.S. at 777 n. 10, 95 S.Ct. at 1289 n. 10. The record simply discloses no evidence— and certainly no evidence independent from the hearsay statement itself—that would satisfy Rule 801(d)(2)(E)'s threshold requirement that Beckham and Monroe be co-conspirators.

 Nonetheless, we do not reverse Beckham's conviction, because we agree with the government that Monroe's statement was properly admitted under a different exception to the hearsay rule, the exception for adoptive admissions set forth in FED.R.EVID. 801(d)(2)(B).[3] This exception is firmly rooted in American jurisprudence. *See Berrisford v. Wood,* 826 F.2d 747, 751 (8th Cir.1987), *cert. denied,* 484 U.S. 1016, 108 S.Ct. 722, 98 L.Ed.2d 671 (1988); *United States v. Monks,* 774 F.2d 945, 952 (9th Cir.1985); *see also United States v. Lemonakis,* 485 F.2d 941, 949 (D.C.Cir.1973) (recognizing that adoptive admissions constitute "a long-recognized hearsay exception"), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); 4 WIGMORE ON EVIDENCE, §§ 1069–1075 (Chadbourn rev. 1972) (citing English, Canadian, and state court cases going back to the early years of the Republic). No independent inquiry under the Confrontation Clause is therefore required. *See White v. Illinois,* —— U.S. ——, ——, 112 S.Ct. 736, 743, 116 L.Ed.2d 848 (1992). Under this exception,

---

2. Beckham was never charged with the crime of conspiracy; the issue arose only as part of the evidentiary dispute. The government need not charge the defendant with conspiracy in order to admit hearsay statements into evidence under the co-conspirator exception. *See United States v. Perholtz,* 842 F.2d 343, 356 (D.C.Cir.1988), *cert. denied,* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1989) (per curiam). It need only prove by a preponderance of the evidence that a conspiracy existed between the defendant and the declarant and that the statement was made in furtherance of that conspiracy. *See Bourjaily,* 483 U.S. at 175, 107 S.Ct. at 2778.

3. Although the adoptive admission exception was raised only tangentially before the district court—and then only by defense counsel—we are entitled to consider it when raised by the government on appeal as part of the harmless error inquiry. FED.R.CRIM.P. 52(b) directs that "[a]ny error ... which does not affect substantial rights shall be disregarded." If evidence erroneously allowed in under one rule would nonetheless have been admissible under another, no substantial right of the defendant has been affected. *See, e.g., United States v. Wiggins,* 530 F.2d 1018, 1022 (D.C.Cir.1976) (per curiam). Such an error cannot be used to reverse an otherwise valid conviction.

Monroe's statement may be used against Beckham as long as he "manifested an adoption or belief in its truth." FED. R.EVID. 801(d)(2)(B). Beckham must have "understood and unambiguously assented to [Monroe's] statement[ ]," *Naples v. United States,* 344 F.2d 508, 511 (D.C.Cir. 1964), *overruled in part on other grounds, Fuller v. United States,* 407 F.2d 1199, 1221–22, 1230 n. 42 (D.C.Cir.1968) (en banc), *cert. denied,* 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969), but his understanding and assent may be established through conduct as well as through words. *See Marshall v. Young,* 833 F.2d 709, 716 n. 3 (7th Cir.1987).

■ When Monroe told Officer Dunston that he could get another rock of crack from "my buddy," Beckham immediately got up from his chair, walked over to a stash of crack that was packaged for distribution, and began to open it. By that action, Beckham indicated his endorsement of Monroe's statement. *See, e.g., United States v. Rollins,* 862 F.2d 1282, 1296–97 (7th Cir.1988) (defendant's completion of a drug transaction constituted adoption of the statements of the person who proposed it), *cert. denied,* 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989). Of course, appellant denied this account of the facts. But where the facts bearing on admissibility conflict, the court need only find that it is more probable than not that the facts favoring admissibility exist in order to allow the evidence in. *See Bourjaily,* 483 U.S. at 175–76, 107 S.Ct. at 2778–79. The weight and credibility of the evidence is then left for the jury to evaluate. The district court, in the course of ruling that a preponderance of the evidence supported a determination of conspiracy, necessarily credited the government's version of events—that Beckham responded directly to Monroe's statement, which indicated Beckham's intent to distribute the drugs he possessed. Accordingly, Monroe's statement was admissible under the adoptive admissions exception to the hearsay rule.

\* \* \* \* \* \*

■ Beckham's second claim is that the district court erred in refusing to instruct

the jury on the lesser-included offense of simple possession. The district judge is obliged to give a lesser-included offense instruction when "a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater." *Schmuck v. United States,* 489 U.S. 705, 716 n. 8, 109 S.Ct. 1443, 1450 n. 8, 103 L.Ed.2d 734 (1989). We have said that a lesser-included offense instruction is required "if there is any evidence fairly tending to bear upon the lesser included offense, 'however weak' that evidence may be." *United States v. Thornton,* 746 F.2d 39, 47 (D.C.Cir.1984) (quoting *Belton v. United States,* 382 F.2d 150, 155 (D.C.Cir. 1967). Even when it is "the prosecution's evidence [that] provides a 'rational basis' for the jury's finding the defendant guilty of a lesser offense," the instruction must be given. *United States v. Payne,* 805 F.2d 1062, 1067 (D.C.Cir.1986) (per curiam) (quoting *Thornton,* 746 F.2d at 48).

■ Here, however, there was *no* evidence from which a jury could rationally have concluded that Beckham possessed crack without intending to distribute it. No aspect of the government or defense cases—not even a combination of aspects of each—supports a simple possession theory. Beckham argues that the jury could have believed him guilty of simple possession if it believed his glove story: he picked up the dirty glove out of curiosity, felt something bulky inside of it, turned it upside down, and stuck out his hand as the plastic bag fell out; upon inspecting the bag, he realized that it contained crack but failed to drop it in the couple of seconds before Officer Dunston arrested him. As a matter of law, however, these facts, if true, would not support a conviction. Inadvertent or accidental possession does not satisfy the statutory requirement that possession be knowing or intentional. *See* 21 U.S.C. § 844(a).

Alternatively, Beckham contends that the jury might rationally have concluded that he "just happened to pick up the plastic bag of crack near the bench at an inopportune moment" for some reason totally unrelated to Officer Dunston's purchase

from Monica Monroe (but presumably not by accident). Even if that were so—if there were no direct evidence of an actual drug transaction—Beckham was guilty of more than simple possession. The bag Beckham picked up contained 34 individually wrapped rocks of crack of a uniform size typical of street distribution. The street value of the more than 13 grams involved was $1,700. That amount of crack so packaged indicates an intent to distribute and not to possess for personal consumption. *Cf. United States v. Gibbs*, 904 F.2d 52, 58–59 (D.C.Cir.1990) (reversing denial of lesser-included simple possession instruction where there was virtually no evidence that the stash was incompatible with personal use). According to the completely unrebutted testimony of the government's drug expert, no mere user would ever possess drugs in the quantity and form that this crack was in, for the simple reason that his loss would be too great if the drugs he purchased turned out to be counterfeit. In order for the jury to have found Beckham guilty only of simple possession, it would have had to discredit completely this testimony without any evidentiary basis for doing so. The jury would also have been required to believe Officer Dunston's general account of the arrest while disbelieving his testimony about Monroe's statement—again, without any evidence before it suggesting that the officer's testimony was more reliable in one respect than another. This combination of testimonial inferences is too attenuated and improbable to require a lesser-included offense instruction. *Cf. Payne*, 805 F.2d at 1067. Failure to give such an instruction would, in any event, have been harmless error, because the jury could not have found Beckham guilty as it did of aiding and abetting Monroe without crediting the portion of Officer Dunston's testimony that made intent to distribute a foregone conclusion. We therefore affirm Beckham's conviction.

### III.

Beckham asserts that he is entitled to resentencing, because the district court, by holding that it had no discretion to depart downward in Beckham's case, misunder-

stood its authority under the Sentencing Guidelines. For Beckham's crime, the base offense level was 26, and his criminal history category was V. This would ordinarily have yielded a sentencing range of 110 to 137 months in prison. His sentence was tripled to 360 months (or 30 years) to life, however, because he was classified as a career offender, *see* U.S.S.G. § 4B1.1, which increased his offense level to 37 and his criminal history category to VI. His classification was based upon a 1988 conviction for attempted possession with intent to distribute cocaine and on a 1975 armed robbery Beckham had committed at the age of 18.

The district judge said at sentencing that he felt the sentence was "extraordinarily harsh" and "excessive" in light of Beckham's criminal record, his family involvement, and his employment history. Beckham urged several possible grounds for departure, including his youth, his family responsibilities, his contrition, and the "grossly disproportionate" nature of the penalty. But the district court thought that none of these provided the necessary authority. "I do not see that I have any discretion in the matter. Congress and the Sentencing Commission have taken that away from me."

Although a refusal to depart downward *where there is authority to do so* is within the unreviewable discretion of the district court, *see United States v. Hazel*, 928 F.2d 420, 424 (D.C.Cir.1991), we will remand a case for resentencing when the district court indicates erroneously that "his discretion was constrained in a way that it actually was not." *Id.* at 425; *see also United States v. Ortez*, 902 F.2d 61, 63–64 (D.C.Cir.1990). Before the district court, Beckham complained about the harshness of his sentence in general terms, but he disclaimed knowledge of any specific authority in the Guidelines for departing downward based on a mismatch between his sentence and the seriousness of his misdeeds. On appeal he makes a more refined argument based on the specific Guidelines provision that authorizes downward departure "where the court concludes

that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history." U.S.S.G. § 4A1.3.[4] He points out that although he "just barely qualifie[s]" as a career offender under § 4B1.1, the staleness of one of the two prior felony convictions that served as the predicate for applying that section—his only violent felony occurred 15 years prior to the present offense—makes the mandatory criminal history category of VI for the typical career offender disproportionate to the seriousness of his criminal history.[5]

■ We agree with the government that disproportionality does not, *in itself*, provide an appropriate basis for a downward departure. Unless the disproportionality between crime and punishment is so extreme that it violates the Eighth Amendment, *cf. Harmelin v. Michigan*, — U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)—a contention Beckham disclaims— the sentences established for various crimes under the Guidelines cannot be set aside based merely on their perceived severity. *See, e.g., United States v. Gonzales–Lopez*, 911 F.2d 542, 551 (11th Cir. 1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991); *United States v. Studley*, 907 F.2d 254, 260 (1st Cir.1990). To permit departures for that reason would be to eviscerate the Guidelines, reestablishing the very judicial discretion in sentencing that the Guidelines were designed to confine. *See Mistretta v. United States*, 488 U.S. 361, 396, 109 S.Ct. 647, 667, 102 L.Ed.2d 714 (1989).

■ We also agree, however, with the unanimous judgment of the other circuit courts to have considered the issue that § 4A1.3 authorizes a downward departure when criminal history category VI, assigned pursuant to the career offender guideline, significantly overrepresents the

seriousness of a defendant's past criminal conduct and the likelihood of recidivism. *See United States v. Bowser*, 941 F.2d 1019, 1023–24 (10th Cir.1991); *United States v. Pinckney*, 938 F.2d 519, 521 (4th Cir.1991); *United States v. Lawrence*, 916 F.2d 553, 554–55 (9th Cir.1990); *United States v. Brown*, 903 F.2d 540, 545 (8th Cir.1990); *cf. United States v. Baskin*, 886 F.2d 383, 389 (D.C.Cir.1989) (recognizing the possibility of downward departure for a career offender and citing § 4A1.3), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990). Congress defined career offenders in the Sentencing Commission's authorizing statute and directed the Commission to ensure that they be sentenced "at or near the maximum term authorized." 28 U.S.C. § 994(h). The Commission carried out this directive in part by providing that "[a] career offender's criminal history category in every case shall be category VI." U.S.S.G. § 4B1.1. But Congress gave the Sentencing Commission authority to "maintain[ ] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1)(B). The Commission used this authority in adopting § 4A1.3, which it said was designed to "recognize[ ] that the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur." U.S.S.G. § 4A1.3, commentary. In authorizing a departure from the guideline range when "the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct," the Commission did not exclude category VI or career offenders; indeed, the last paragraph of § 4A1.3 explicitly recognizes that departures from category VI occasionally may be warranted. Section

---

4. Although § 4A1.3 is technically a "policy statement" rather than a "guideline," it is "an authoritative guide" to making departures under the Guidelines. *Williams v. United States*, — U.S. ——, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992); *see also* 18 U.S.C. §§ 3553(a)(5), 3553(b) (directing courts to take policy statements into account in sentencing).

5. Although this refinement of the disproportionality argument was not raised below, the government failed to object to it, or even to comment upon it, in its brief, thus waiving any waiver argument it may have had. *See United States v. McNeil*, 911 F.2d 768, 772 (D.C.Cir. 1990) (per curiam).

4A1.3 also explicitly suggests that departure might be warranted where the convictions supporting a criminal history score are old—"close to ten years prior to the instant offense"—and where a lengthy period of law-abiding behavior has intervened. U.S.S.G. § 4A1.3. Of course, departure under § 4A1.3 is only justified in the rare and unusual case in which a defendant's criminal history category *significantly* overrepresents the seriousness of his past conduct and future threat to society. *See, e.g., Bowser,* 941 F.2d at 1027; *United States v. Adkins,* 937 F.2d 947, 952 (4th Cir.1991). But because the district court was unaware that § 4A1.3 might provide authority for a downward departure in a case like Beckham's, we remand the case for resentencing.

*It is so ordered.*