UNITED STATES of America, Appellee

v.

George HARRISON, a/k/a Gregory
Peck Williams, Appellant.

No. 94–3039.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 18, 1996.

Decided Jan. 3, 1997.

Jonathan S. Zucker, appointed by the court, argued the cause and filed the briefs, Washington, DC, for appellant.

George Harrison, appearing pro se, was on the separate briefs for appellant.

Steven E. Rindner, Assistant U.S. Attorney, Washington, DC, argued the cause, for appellee, with whom Eric H. Holder, Jr., U.S. Attorney, John R. Fisher, and Thomas C. Black, Assistant U.S. Attorneys, were on the brief. Elizabeth H. Danello, Assistant U.S. Attorney, entered an appearance.

Before: WILLIAMS, GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion dissenting in part filed by Circuit Judge RANDOLPH.

GINSBURG, Circuit Judge:

George Harrison was convicted of six drug and weapon charges. On appeal, Harrison

raises a number of evidentiary, statutory, and constitutional arguments for reversal. We affirm his conviction on three counts, reverse on three counts, and remand the matter for resentencing.

## I. Background

For much of 1991 and 1992 Harrison ran a drug business out of various apartments at 601 Virginia Avenue, S.W., Washington, D.C. Several women who lived at the apartment building helped Harrison by storing drugs and money for him and on occasion dealing for him. In October 1992 Washington police officers, pursuant to a valid warrant, entered and searched Apartment 507 at 601 Virginia Avenue, the home of Dominga Montivero and her daughter Daniela. The police found 45 grams of crack cocaine in 119 ziplock bags under the kitchen sink. Dominga Montivero told the police that the drugs belonged to Harrison and that he would be returning for them. When Harrison arrived fifteen minutes later, carrying a gun in the waistband of his pants, the police arrested him. Earlier (May 1991) a Maryland state trooper had stopped Harrison on suspicion of driving under the influence of alcohol or drugs. A consensual search of Harrison's car had netted two guns and more than 500 grams of cocaine powder.

A grand jury charged Harrison with (1) conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846; (2) using and carrying a firearm during the drug trafficking offense charged in Count One, in violation of 18 U.S.C. § 924(c)(1); (3) unlawful possession with intent to distribute five grams or more of cocaine base on or about October 20, 1992, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii); (4) using and carrying a firearm during the drug trafficking offense charged in Count Three, in violation of 18 U.S.C. § 924(c)(1); (5) unlawful possession with intent to distribute cocaine base on or about October 20, 1992, within 1,000 feet of a school, in violation of 21 U.S.C. § 860(a); and (6) unlawful possession of a firearm by a fugitive, in violation of 18 U.S.C. § 922(g)(2). After motions hearings and a trial in the district court, the jury convicted Harrison of all six counts.

## II. Analysis

Harrison challenges all six convictions. As to three of them he succeeds.

### A. Conspiracy

Harrison argues that there was insufficient evidence to convict him of conspiracy because the individuals with whom he is alleged to have conspired agreed to help him only out of fear that he would hurt them if they did not. Rather than the ringleader of a group of drug dealers, Harrison argues, he was a solo entrepreneur who procured help from weak and defenseless women by threatening to shoot them and by "smacking [them] around." Harrison does not pretend that his method of drug dealing makes him any less a villain, only that the absence of an agreement, "the essential element of conspiracy," *Iannelli v. United States,* 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975), requires reversal of count one.

We may admire Harrison's argument for its daring, but it is unsupported by the record. At least one of Harrison's female minions willingly agreed with Harrison to possess and to distribute drugs. Dominga Montivero testified that she agreed to help Harrison with his drug business, that she helped him to distribute drugs, and that he did not force her to do so. Harrison certainly did use violence and the threat of violence to get his way, but his savage propensities do not render involuntary every agreement made with him. One may agree to join up with an individual whom one fears. When such an alliance may be profitable, it is not even improbable.

Harrison's reliance upon the distinction between aiding and abetting and conspiracy that we drew in *United States v. Beckham,* 968 F.2d 47, 51 (1992), avails him not. In contrast to the facts of *Beckham,* here the evidence provides more than a "scant basis for inferring that the defendant and another were joint venturers in a criminal enterprise or had any sort of prior agreement." *Id.* Accordingly, viewing the evidence in the light most favorable to the Government, as we

must, *United States v. Jenkins,* 981 F.2d 1281, 1283 (D.C.Cir.1992), we hold that there was sufficient evidence for the jury to find that Harrison and Dominga Montivero agreed to possess and to distribute cocaine base.

■ Harrison also challenges the lawfulness of certain of the evidence proving the conspiracy, namely the drugs and guns that the Maryland state trooper seized from his car. Although Harrison does not deny that he consented to the search after the trooper pulled him over, he argues that the trooper lacked probable cause to make the stop in the first place. We review *de novo* the district court's determination that the trooper had reasonable suspicion to stop Harrison. *Ornelas v. United States,* — U.S. —, ——, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996).

■ A police officer may not stop and detain an individual unless he is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The trooper testified that he observed Harrison's car "touch the right lane marking, and then touch the left lane marking." From this swerving of the car, the trooper inferred that Harrison may have been driving under the influence of alcohol or drugs. That was a reasonable inference and an adequate basis for the traffic stop.

B. Possession with intent to distribute a controlled substance within 1,000 feet of a school

■ Harrison launches three separate but ultimately unsuccessful attacks upon his conviction for violating the schoolyard statute. Although Harrison does not challenge the legality of the search of Dominga Montivero's apartment, he does assert that the police violated his rights under the Fourth Amendment to the Constitution of the United States by remaining in the apartment after the search had been completed. If, of course, the police had not remained in the apartment until Harrison arrived, then the link between Harrison and the 45 grams of crack cocaine found in the apartment would be more tenuous.

Harrison did not raise this objection at trial and the district court did not commit plain error by failing to raise it for him. Harrison has no standing to object to the presence of the police in the Montiveros' apartment because he had no privacy interest in that apartment. *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176 (1969). Harrison did not live there and was not a guest there; he merely stored his drugs in the apartment, and he may not assert a privacy interest upon that basis. *See United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980) (possession of seized good no substitute for factual finding that owner of good had legitimate expectation of privacy in area searched).

■ Harrison also argues that the prosecution relied upon perjured testimony in establishing a connection between him and the drugs sufficient for the jury to infer that he constructively possessed the drugs. In her testimony before the grand jury Daniela Montivero testified that the last time she had seen Harrison with crack cocaine was in June or July 1992. At trial, however, when asked whether she had ever seen drugs stored in a particular canister Montivero testified that on the morning of October 20, 1992 she saw Harrison give her mother a large number of sandwich bags, which her mother placed in the canister. Technically, Montivero's trial testimony is not even inconsistent with her grand jury testimony: Although Montivero later learned, and may at the time have suspected, that the sandwich bags contained crack cocaine, she did not testify that she saw Harrison with drugs on October 20. Moreover, even if the testimony is inconsistent, an inconsistency between the grand jury and trial statements of a witness does not by itself support an inference that the Government knowingly sponsored false testimony. *United States v. Hemmer,* 729 F.2d 10, 17 (1st Cir.1984).

■ Harrison's final challenge to the schoolyard count, that there was insufficient evidence that the drugs found in Apartment

507 were within 1,000 feet of a school, has some merit. At trial a police officer testified that the distance between the school and the main entrance of the building at 601 Virginia Avenue was approximately 472 feet. The Government also showed the jury an aerial photograph of the area including the school and the apartment building.

After the trial in this case, we held that in order to convict under the schoolyard statute the Government must show that the distance from a school to the actual location of the drugs, not simply to the outer wall or main entrance of the building in which the drugs were found, is less than 1,000 feet. *United States v. Johnson,* 46 F.3d 1166, 1169–70 (D.C.Cir.1995). The Government failed to make such a measurement here but the error was harmless. By reference to the photograph of the buildings the jury could easily see—as we have done—that if the distance between the school and the apartment building is 472 feet, then the distance from the school to any individual apartment within the building must be a good deal less than 1,000 feet. *Cf. United States v. Applewhite,* 72 F.3d 140, 143–44 (D.C.Cir.1995) (where distance from school to building was 920.2 feet, jury could not infer that relevant apartment within building was less than 1,000 feet from school). The "spatial leeway" afforded by 528 feet and the evidence provided by the aerial photograph are sufficient to support the jury's finding. *See United States v. Baylor,* 97 F.3d 542, 546–47 (D.C.Cir.1996) (failure to measure from school to actual location of drugs harmless error where distance from school to apartment building only 534 feet and Government introduced map and photographs of area).

Finally, the Government concedes that the conviction for possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), must be vacated because it is a lesser-included offense of possession with intent to distribute a controlled substance within 1,000 feet of a school. *United States v. Whren,* 53 F.3d 371, 376 (D.C.Cir.1995). Consequently, we affirm Harrison's conviction on Count Five and reverse his conviction on Count Three.

## C. The § 924(c)(1) counts

Harrison was convicted of two violations of 18 U.S.C. § 924(c)(1). The first conviction, for which the conspiracy count is the underlying offense, was based upon the guns found by the Maryland state trooper in the trunk of Harrison's car. The Government concedes that this count must be vacated in light of the Supreme Court's holding in *Bailey v. United States,* — U.S. —, —, 116 S.Ct. 501, 509, 133 L.Ed.2d 472 (1995), that the "use" component of the statute requires the Government to show that the defendant "actively employed" the gun. As the Government points out, however, the United States Sentencing Guidelines provide for a two-level increase in the offense level for a drug conspiracy if there is sufficient evidence, as there is here, that the defendant possessed a gun during the conspiracy. (This enhancement is not available if the defendant is separately convicted under § 924(c)(1) for the same incident.) We therefore remand the conspiracy count for resentencing pursuant to U.S.S.G. § 2D1.1(b)(1).

■ The second § 924(c)(1) count was expressly limited in the indictment to Harrison's carrying of a .357 caliber pistol during and in relation to his possession with intent to distribute offense of October 20, 1992. The Government argues that the district court's impermissibly broad definition of "use" of a gun was harmless with respect to this § 924(c)(1) count because "there was only evidence that appellant 'carried' the firearm, and none that he 'used' it."

The fatal flaw in this count, however, lies not in the district court's jury instruction but in the Government's evidence. Harrison does not dispute that he was carrying a gun in his waistband when he was arrested by the police on October 20, 1992. Nevertheless, because the predicate offense for that count had been completed (or foiled) some 15 to 20 minutes prior to Harrison's arrival at the apartment Harrison argues that there was no evidence that he also carried the .357 caliber pistol "during" the underlying offense of possession with intent to distribute.

■ The court considers the sufficiency of the evidence in the light most favorable to

the Government, allowing the Government the benefit of all reasonable inferences that may be drawn from the evidence. *Jenkins,* 981 F.2d at 1282. This review, although deferential, is not servile:

> We do not . . . fulfill our duty through rote incantation of these principles followed by summary affirmance. We must ensure that the evidence adduced at trial is sufficient to support a verdict as a matter of law. A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation.

*United States v. Long,* 905 F.2d 1572, 1576 (D.C.Cir.1990) (Thomas, J.) (reversing § 924(c)(1) conviction because of insufficient evidence that defendant used gun found in sofa of apartment from which he distributed drugs).

The Government tries to ignore Harrison's sufficiency of the evidence argument by addressing it summarily in a footnote. That is not a winning gambit.

At trial the Government argued that, in order to convict on this count, the jury had to find only that Harrison was carrying the gun when he was arrested. Not so. The carrying of the gun had to be "during and in relation to" the possession of the cocaine, not simply on the same day. The Government now argues that a rational juror could infer that there must have been some overlap between the time during which Harrison constructively possessed the cocaine and the time at which he carried the .357 Magnum. The facts do not support such an inference.

The Government elicited no evidence connecting Harrison and the .357 Magnum during the time of his constructive possession. The only evidence linking Harrison to the drugs is the testimony of the Montiveros that he dropped off the cocaine earlier that day. Daniela Montivero testified that Harrison had dropped off the cocaine before she left for school, which was at 3:45 p.m. Dominga Montivero testified only that Harrison had dropped off the drugs sometime earlier "that evening," an ambiguous reference that can mean either "the period from sunset . . . to ordinary bedtime" or, in the South, "the time extending roughly from noon to twilight."

*See Webster's New International Dictionary* (3d ed.1961). What Dominga Montivero, a native Spanish speaker who learned her English in Washington, meant by the word we can only guess. In any event, Harrison no longer had even constructive possession of the cocaine once the police seized it, which was around 7:30 p.m. Some fifteen minutes later Harrison arrived at the apartment carrying the .357 Magnum.

Upon these facts either of two scenarios would support the Government's theory. First, Harrison might have carried the gun with him when he dropped off the drugs at the Montiveros' apartment. But neither Dominga nor Daniela testified to seeing a gun on Harrison at that time and we can not infer, as the Government would have us do, that Harrison must have had the .357 Magnum on him at that time because, as the Government characterizes the defendant, he "routinely carried weapons with him." Alternatively, Harrison might have placed the .357 Magnum in his waistband more than fifteen minutes before he went to the apartment at 7:45. There is no evidence of Harrison's activities or whereabouts, however, from the time he dropped off the drugs earlier that "evening" until he returned at 7:45. One could properly infer that Harrison was carrying the .357 Magnum, say, 30 seconds before he arrived at the apartment. If anything at all were known of his activities (for example, he climbed several flights of stairs to get to the apartment) perhaps one could say the same for a longer period. But to infer that the defendant carried a specific gun on his person at 7:30 (or earlier) merely because he carried the gun with him at 7:45 is to cross the line from reasonable inference to mere speculation.

Our reluctance to uphold a conviction based upon such tenuous evidence is increased by evidence that Harrison routinely stored guns in other apartments in the building and by evidence suggesting that Harrison had a reason for carrying the gun on his second trip to the apartment that he did not have earlier in the day. Dominga testified that Harrison had told her that he was planning to leave that night for Florida. If he was going to leave for Florida shortly after

stopping by the apartment at 7:45, then he may well have picked up the gun just beforehand for protection on his trip. Alternatively, it is likely that Harrison (who, according to Dominga, was downstairs in another apartment when the police arrived) knew of the raid and when he saw certain officers leave went to the Montiveros' apartment in order to see what had happened. Whether his intent was to "find out whether the police found his drugs" as the Government argued at trial, or to ensure that Montivero had not "snitched"—Harrison had a history of beating up women whom he considered snitches—Harrison certainly had reason to arm himself before proceeding to the Montiveros' apartment.

Each of these speculations is at least as plausible as the Government's assertion that Harrison had the .357 caliber pistol on his person when he constructively possessed the drugs. In these circumstances it is simply not possible for a jury reasonably to infer beyond a reasonable doubt that, because Harrison was carrying a .357 caliber pistol at 7:45 p.m., he must have been carrying the same gun earlier that day.

D. Unlawful possession of a firearm by a fugitive

■ Count Six charged Harrison with a violation of 18 U.S.C. § 922(g), possession of a firearm by a fugitive. Counsel for Harrison proffered a stipulation that his client was a fugitive on the day of his arrest. The court did not enter a formal stipulation but it did, at the express urging of defense counsel, omit the element of fugitive status in instructing the jury on that count. Now, in a classic example of attempted "sandbagging," *see Wainwright v. Sykes*, 433 U.S. 72, 89, 97 S.Ct. 2497, 2507–08, 53 L.Ed.2d 594 (1977), Harrison claims that the conviction should be vacated because the instruction was invalid.

If there was any error in the trial court's instruction to the jury, Harrison invited the error and is therefore barred from complaining about it on appeal. *See Wagner v. Taylor*, 836 F.2d 596, 599 (D.C.Cir.1987) ("It has long been settled that on appeal a litigant cannot avail himself of an error that he induced the court under review to commit");

*United States v. Wiggins*, 530 F.2d 1018, 1020 (D.C.Cir.1976) (defendant in criminal trial "precluded from assigning as error an instruction which his counsel specifically requested and approved"). That one will not be heard to complain of receiving what one asked for has a long tradition both in jurisprudence, as in the doctrine of estoppel, and in common wisdom. *See, e.g.*, Seneca, *Epistles*, 95, I ("Do not ask for what you will wish you had not got").

■ Nevertheless, Harrison argues that the court should review the trial court's omission for plain error because "there is no indication that the waiver was knowing, voluntary or intelligent." To the contrary, the record shows that counsel for Harrison deftly convinced the district court to drop the element of fugitive status from the charge despite the court's initial hesitancy to do so. Harrison made a tactical decision—and undoubtedly a wise one—in order to avoid any prejudice that might attach should the jury learn that he was a fugitive. To reverse his conviction in these circumstances would be utterly pointless except to provide an incentive for future litigants to lead the district court astray in order to profit from the resulting error.

### III. Conclusion

We affirm Harrison's convictions on Count One, conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base; Count Five, possession with intent to distribute five grams or more of cocaine base within 1,000 feet of a school; and Count Six, unlawful possession of a firearm by a fugitive. We reverse the convictions on Counts Two and Four, the § 924(c)(1) counts; and on Count Three, the possession with intent to distribute offense underlying Count Five. In addition, we remand the conspiracy count for resentencing.

RANDOLPH, Circuit Judge, dissenting in part:

In my view there was enough evidence to support the verdict on Count 4 and I would therefore affirm Harrison's conviction for violating 18 U.S.C. § 924(c)(1). As charged,

this count required the government to prove that Harrison used or carried a .357 caliber pistol "during and in relation" to the crime of possession with intent to distribute crack cocaine "on or about October 20, 1992."

The drugs were found in Dominga Montivero's apartment, No. 507, under the kitchen sink. The police entered the apartment at 7:30 p.m. About 10 to 15 minutes later, Harrison arrived carrying a .357 caliber pistol under his shirt, tucked in his waistband. The police immediately arrested him. The majority assumes that Harrison was not at that moment violating § 924(c)(1). By then, his offense of constructive possession had ended because, at 7:30 p.m., the police had seized the drugs. To make out a § 924(c)(1) violation, the government therefore had to prove that Harrison was carrying the pistol sometime before 7:30 p.m., that is, "during" his constructive possession of the drugs.

How long did Harrison possess the crack cocaine seized in the apartment? Two days, the jury could have found. Montivero testified that she saw him cooking a "pancake" of crack in another apartment in the building (No. 408) a "couple" of days before his arrest. The indictment charged him with possession with intent to distribute "on or about October 20, 1992." If Harrison was carrying the .357 caliber pistol at any time between October 18 and October 20 at 7:30 p.m., he was carrying the gun "during" the commission of the predicate drug offense.

The jury also could have found that the only gun Harrison had at hand from October 18 to October 20 was the .357 caliber pistol mentioned in Count 4. There was evidence that from 1991 until his arrest in this case, Harrison used seven different guns to ply his drug trade. In 1991, the Maryland police confiscated two of these guns; later in the year, the D.C. police seized another. That left four: two 9 mm. semi-automatics; a silver pistol with black tape on its handle; and the .357 caliber pistol. Both semi-automatics were seized by the police when Harrison shot a young man in the spring of 1992. As to the silver pistol, Harrison had stashed it in Montivero's apartment in early October 1992, a few weeks before his arrest in this case. Montivero's 16-month-old granddaughter found the gun and accidentally shot herself in the leg. Before the police arrived, someone named "Charlene" came to the apartment and took the gun away. On October 20, 1992, the date of Harrison's arrest, the police searched the only other place he was known to occupy (apartment No. 408 in the same building) and his car. No guns were found.

The jury therefore had ample evidence that the .357 pistol was the only gun Harrison carried around as his personal weapon on October 20, 1992, and shortly before. Did Harrison carry this pistol "during" his possession of the crack cocaine? Here the evidence is circumstantial, but in my view sufficient.

For one thing, Harrison always had guns at hand. Nearly every time he went to Montivero's apartment, he carried guns. His usual practice was to have one in his waistband. When he prepared crack cocaine, as he did in apartment No. 408 on October 18, 1992, he had a gun with him. Each time the police arrested him—twice in 1991, once in the spring of 1992, and again in October—he was carrying a gun. Add to this the fact that when Harrison dropped the crack off at Montivero's apartment on October 20, before 7:30 p.m., he told her that he was getting ready to leave for Florida. After his arrest, the police found his Buick Riviera with Florida plates parked in front of the apartment building. The car was packed with men's clothing. In the trunk, in garment bags, the police found $1309 in cash. In apartment No. 408, where Harrison had been staying, he had left behind nothing but old personal papers.

The evidence thus indicated that Harrison was about to leave town, that he gave Montivero his drugs while he packed his car and made other arrangements for his trip, and that he returned to Montivero's apartment, with a gun stuffed in his pants, to pick up the crack he had cooked two days before. Viewed in the light most favorable to the prosecution, the evidence supports the jury's conclusion that during the time Harrison possessed these drugs—from October 18 until October 20 at 7:30 p.m.—he carried his gun, the .357 caliber pistol. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). To conclude otherwise

one would have to believe that as Harrison loaded his clothes and money into his car, he left his gun behind; that as he walked to Montivero's apartment to drop off the drugs, he left his gun elsewhere; that although he was carrying the gun at 7:40 p.m., he was not carrying it at 7:30 p.m. These are possibilities, to be sure, but highly unlikely.

One further point. If, as the jury found, Harrison did carry the gun at some time in the hours leading up to his arrest, there is no doubt that he carried it "in relation to" his possession of the drugs, as § 924(c)(1) requires for conviction. Drugs were Harrison's line of work. He frequently used violence in his business. Guns were his preferred method of operation. He used guns to protect himself and his drugs, to intimidate neighbors, and to keep his subordinates in line. So if Harrison was engaged in drug-related activities shortly before his arrest, as he surely was, he had the .357 pistol with him "in relation to" those activities. No other reason is plausible.

That other inferences are possible from the evidence just discussed is of no moment. When we review criminal convictions for sufficiency of the evidence, our function is not to eliminate all other possibilities. *United States v. Poston,* 902 F.2d 90, 94 (D.C.Cir. 1990); *United States v. Teffera,* 985 F.2d 1082, 1085 (D.C.Cir.1993); *United States v. Wynn,* 61 F.3d 921, 923 (D.C.Cir.1995). What matters is whether the inferences the jury drew are supported, whether drawing them would enable a rational person to conclude that the defendant was guilty beyond a reasonable doubt. The evidence against Harrison on Count 4 was not overwhelming. It was largely circumstantial. But under the test we must apply, it was sufficient. I therefore dissent from this portion of the majority's decision.